## No. 12,773.

LEADVILLE MINE DEVELOPMENT COMPANY *v.* ANDERSON
ET AL.
(17 P. [2d] 303)

Decided November 21, 1932.

Mr. Jos. W. CLARKE, for plaintiff in error.

Mr. E. H. STINEMEYER, Mr. WALLACE SCHOOLFIELD, for defendants in error.

*En Banc.*

MR. JUSTICE BUTLER delivered the opinion of the court.

In a water adjudication proceeding the Leadville Mine Development Company, herein referred to as the company, claimed certain water rights prior and superior to existing appropriations of water rights on the Arkansas

river.  Albert Anderson, J. H. Habenicht, Ben Behrman, Fred Post and Richard Sneddon, owners of water rights on that river opposed the company's claim to priority. The court awarded the company's claim to the extent of six cubic feet of water per second of time.  The court, however, refused to decree such water right to be prior and superior to the rights of the objectors, but, on the contrary, awarded it priority as of March 16, 1921, which made it subject to their appropriations.

The company owns the Canterbury tunnel in Lake county.  It is in the Arkansas river watershed.  The portal is situated on a mountainside, is about 1,000 feet from the Arkansas river, and is at a considerably higher elevation than the river.  About 1,940 feet from the portal the tunnel passed through a porphyry dike some twenty feet thick.  A short distance beyond the dike a considerable increase in the flow of water was encountered.  The water was carried through two boxes to the portal of the tunnel, and from there it flowed down the mountainside into the Arkansas river.  On February 2, 1923, Edward W. Keith, an agent of the company, filed a claim to a right to the use of such water for mining, milling, irrigation and other purposes, and thereupon deeded his rights to the company.  Thereafter there was constructed a ditch, through which the water was carried across the river.

Where a person by his own efforts has increased the flow of water in a natural stream, he is entitled to the use of the water to the extent of the increase. *Platte Valley Irrigation Co. v. Buckers Irrigation, Milling and Improvement Co.*, 25 Colo. 77, 53 Pac. 334; *Ripley v. Park Center Land and Water Co.*, 40 Colo. 129, 90 Pac. 75; *Bieser v. Stoddard*, 73 Colo. 554, 216 Pac. 707; *Comrie v. Sweet*, 75 Colo. 199, 225 Pac. 214.  But to entitle him to such use, he must prove that the water thus added to the stream was produced and contributed by him, and that, if not interfered with, but left to flow in accordance with natural laws, it would not have reached the stream;

and he must prove this by clear and satisfactory evidence. *Comrie v. Sweet, supra,* p. 201.

Two witnesses, called by the company as experts, described the geology of that vicinity. A plat introduced in evidence shows the porphyry dike extending down from the lower of the two porphyry layers. The plat shows immediately above the tunnel a thick layer of limestone; above that two layers of porphyry; above that a layer of shale; and then surface wash. Below the tunnel it shows successive layers of limestone, parting quartzite, white lime and Cambrian quartzite. It also shows two "faults," one between the dike and the portal, and the other a considerable distance beyond the dike. The increased flow of water, according to the testimony, came from the floor of the tunnel. Witnesses testified that since the increased flow was encountered in the tunnel, the flow of springs in the vicinity had not diminished. The company's theory is that shale and porphyry are impervious to water; that the water in question is what is known as "juvenile" water; that before the tunnel was constructed, the water did not reach the river; and that, but for the tunnel, it could not reach the river. The opinions given by the engineers, by whom it was sought to support that theory, were not without reservations and qualifications. Thus, one of the engineers said that water will not penetrate shale or porphyry "readily, unless the formation is badly shattered by breaks to admit water"; that in the Leadville district probably the greater amount of water runs off the surface into the Arkansas river. Asked whether it reached the formation under the shale or the porphyry layers, he answered, "*Well, I cannot say as to that;* but it would be my judgment that a comparatively small portion of it did." He testified that "juvenile" water comes up from below; that "it is possible" that the water from the tunnel "could be" juvenile water. Asked whether the porphyry dike disclosed in the tunnel would act as a dam against the water, he answered, "I think it would be." "Q. After

the action causing the break or deposit, as the case might be, which caused the existence of dike 'x,' would there likely be an amalgamation, if there was a break, which would seal the intersection of that dike with the formation above, so that water would not percolate through it? A. *I cannot say as to that.* It is *possible* there would be a clay parting between the two beds of porphyry, if there were two beds, that would act as a water seal; and *I rather think* that the porphyry dike and the porphyry sheet are one and the same thing; no break between them. Q. In your judgment as an engineer, was there sufficient force or pressure behind the water from the Canterbury tunnel, before the tunnel was driven, to drive it to the surface and make it a part of the flow of the Arkansas river? A. Yes, sir, I think there is sufficient pressure of water to drive a small amount of water through natural channels into the Arkansas river; however, *it is rather hard to answer that question positively;* the elevation of the ground water of the area above the Canterbury tunnel stood at a considerable elevation above the level of the tunnel, and also above the Arkansas river—so a certain amount of water would naturally be forced down into the Arkansas river; although *probably* a very small amount." (Italics are ours.) The other engineer, asked whether the dike is impervious to water, answered, "Probably rather impervious." Asked whether the dike would act as a dam against the water, he answered, "I think it would." "Q. Is it not a fact, Mr. Chapman, that wherever we have, in the Leadville section, dikes crossing formations, that we find that water is backed up behind them? A. A few instances I know, it has always been." Asked whether the water from the tunnel "can" be juvenile water, he answered, "I think so." "Q. Have you ever made such examination of that flow as would determine whether or not it comes through the earth or from the surface above? A. We never have." "Q. If there had been, at the time of this formation, a break between the porphyry dike shown as 'x' and the

overlying sheet of porphyry, what would you say as to the possibility of a sealing of that in time? A. It very probably would be sealed.''

The trial court found that the company ''failed to sustain the burden of proving that the waters which it claims to have developed in and by the Canterbury tunnel did not, prior to their diversion by Interpleader [the company] through the said tunnel, drain, seep or flow, or drain, seep and flow into the Arkansas river and constitute a part of the source of supply thereof.'' After a careful examination of the record, we cannot say that the trial court reached the wrong conclusion. The objectors did not have the burden of showing that the water did reach the river before the construction of the tunnel; but, as we have seen, the burden was on the company to prove by clear and satisfactory evidence that the water was produced and contributed to the river by it, and that, if not interfered with, but left to flow in accordance with natural laws, the water would not have reached the Arkansas river. It is not enough to show that the flow of water to the river was hastened by the construction of the tunnel, but it must be shown that the flow of the river was augmented. *Bieser v. Stoddard,* 73 Colo. 554, 564, 216 Pac. 707; 3 Farnham on Waters and Water Rights, §672d. That the flow of the water to the river was hastened by the construction of the tunnel is clear; but the trial court found that it was not proved by clear and satisfactory evidence that the flow of the river was augmented. The trial court may have concluded that the opportunity for observation of the conditions underground was not sufficient to enable any person to determine whether or not there were cracks and crevices in the dike, above or below the tunnel level, permitting the passage of water; or whether or not there were openings between that dike and the porphyry layer above, so as to permit the passage of water. The testimony does not disclose whether or not the ''fault'' between the dike and the breast of the tunnel was of such a character as to permit surface

water to pass down below the tunnel level; nor does it disclose whether or not water from that or some other source passed through cracks and crevices in the formations below the tunnel level, and was slowed down, in its passage to the river, by the dike, thereby raising the water level to the level of the tunnel, but not preventing the water from ultimately reaching the river, even before the tunnel was constructed.

Upon an examination of the testimony and of the several maps in evidence, we conclude that we would not be justified in setting aside the findings and the judgment.

The judgment is affirmed.