# No. 13,665.

## WATER RIGHTS ADJUDICATION.
### DALPEZ ET AL. *v.* NIX.
(45 P. [2d] 176)

Decided April 29, 1935.

Messrs. MOYNIHAN, HUGHES & KNOUS, for plaintiffs in error.

Messrs. McMULLIN, STERNBERG & HELMAN, for defendant in error.

*En Banc.*

MR. JUSTICE YOUNG delivered the opinion of the court.

THE plaintiffs in error were respondents below and will be herein referred to as respondents, or separately as Dalpez and the water company. The defendant in error, J. W. Nix, was the petitioner and will be herein so designated, or as Nix.

This action was brought by the petitioner to secure an adjudication of his right to the use of water for irrigation which he alleged was developed from seepage and springs on lands to which reference will herein be made as the Dunham lands. The proceeding is brought under chapter 112 of the Session Laws of Colorado, 1905, being section 1766, C. L. 1921. After the hearing the trial court entered a decree granting petitioner priority No. 1 for 38/100 of a cubic foot of water per second from seepage and springs on the Dunham lands as of date April 1, 1909.

The facts necessary to an understanding of the controversy before us are substantially as follows: Wright's Draw is a natural stream running in a general northwesterly direction, more northerly than westerly. A public highway approaches the draw from the east

crossing it over a bridge approximately at right angles. The Dunham land lies east of the draw and south of the road. The Gurley ditch runs along the easterly bank of the draw and parallel to it through the Dunham land and across the road. The Cless ditch belonging to petitioner is about 150 feet long and runs due east and west, parallel to and about 50 feet south of the road. Its fall is to the west and it discharges into the Gurley ditch. From the easterly end of the Cless ditch there are two lines of underground drainage tiles or boxes. One extends easterly 1573 feet as an extension of the Cless ditch and the other runs southeasterly 1385 feet along and a short distance from the easterly side of the draw.

Respondent Dalpez owns the Moreland ditch, which has its headgate on the east bank of the draw north of the road and about 150 feet below the point where the Cless ditch flows into the Gurley ditch. The Gurley ditch belongs to the water company, which has carried through it the water from the Cless ditch to a point further down, where Nix takes it out into his own ditch to irrigate his land. This is the only connection the water company has with this case.

The evidence is undisputed that water formerly seeped into the road; that the grade of the road is downward to the west; that the land south of the road slopes to the north and the land north of it falls slightly to the south. It thus appears that the road is built in a slight depression sloping westerly, the water from which drains into Wright's draw. Before the tile paralleling the road was installed by the county to intercept it, the water had drained into the road to such an extent as to form a bog at the east approach to the bridge across the draw, which bog was about 100 feet above the headgate of the Moreland ditch belonging to Dalpez.

There have been numerous general adjudications of water priorities in water district No. 60 in which the Cless ditch is located. General adjudication decrees were entered in 1897, 1911, 1914, 1916, 1920, 1929 and

1933. Petitioner claimed a right by virtue of an alleged appropriation of April 1, 1909, but in none of the numerous adjudication proceedings did he or his predecessors in interest appear and set forth their claims to the water, priority of right to the use of which is now sought to be adjudicated. In 1897 in a general adjudication the Moreland ditch, now owned by Dalpez, was decreed priorities 6, 10, 17, 20 and 22, all based on appropriations prior to that date out of the waters of Wrights Springs Draw. The findings of the referee in that adjudication proceeding, on which the court's decree was based, contained the following: "That said ditch [the Moreland ditch] derives its supply of water from the waste, seepage and spring water arising in and flowing down Wrights Springs Draw."

Respondents contend that the findings of the referee and decree of the court based thereon in the adjudication proceedings of 1897 are res judicata as to the source of the water supply of the Moreland ditch. In those proceedings the court found that the source of supply of the Moreland ditch came from waste, springs, and seepage in and flowing down Wrights Springs Draw. With the respondents' contention that such determination is res judicata as against the petitioner, we are in accord. Section 1755, C. L. 1921, which was in force at all times during the adjudications hereinabove mentioned, among other requirements, specifies: That a claimant shall set forth "the name of the natural stream from which such ditch, canal or reservoir draws its supply of water." Section 1760, C. L. 1921, was in force when all of the adjudications referred to above were made, and provides: That on the statement filed and testimony taken pursuant thereto, the court "shall ascertain and find from such evidence, as near as may be, the date of the commencement of such ditch, canal or reservoir, together with the original size and carrying capacity thereof as originally constructed, * * * and make and cause to be entered a decree determining and establish-

ing the several priorities of right, by appropriation of water, of the several ditches, canals and reservoirs in such water district, * * *." It seems clear that the statutes contemplate that the source of supply shall be determined. In fact such a determination is an indispensable prerequisite to the determination of priorities, for the term priority connotes two appropriations from the same source of supply, and if a decree were not res judicata as to the source of supply of a ditch, neither could it be res judicata as to the priority of that ditch as related to other ditches drawing upon the same source of supply.

Respondents' second contention is that the evidence clearly shows that the waters in question are one of the sources of supply of the stream in water district No. 60, and as such are not available for an independent adjudication as developed waters. What constitutes artificially developed water has been clearly defined by the decisions of this court. We held in the case of *Comrie v. Sweet,* 75 Colo. 199, 225 Pac. 214: "That one who artificially develops or produces water and adds or turns the same into a natural stream, which water would not in due course otherwise have reached the stream on the surface or in the underlying sands, may acquire a right thereto superior to the adjudicated rights of earlier appropriators of the natural waters of the stream only, may be conceded. When, however, one makes such a claim he should, by clear and satisfactory evidence, prove that the water thus added was produced and contributed by him, and that, if not interfered with and left to flow in accordance with natural laws, it would not have reached the stream." In a late case, *Leadville Mine Development Co. v. Anderson,* 91 Colo. 536, 17 P. (2d) 303, the court used the following language: "Where a person by his own efforts has increased the flow of water in a natural stream, he is entitled to the use of the water to the extent of the increase. *Platte Valley Irrigation Co. v. Buckers Irrigation, Milling and Improvement Co.,*

25 Colo. 77, 53 Pac. 334; *Ripley v. Park Center Land and Water Co.,* 40 Colo. 129, 90 Pac. 75; *Bieser v. Stoddard,* 73 Colo. 554, 216 Pac. 707; *Comrie v. Sweet,* 75 Colo. 199, 225 Pac. 214. But to entitle him to such use, he must prove that the water thus added to the stream was produced and contributed by him, and that, if not interfered with, but left to flow in accordance with natural laws, it would not have reached the stream; and he must prove this by clear and satisfactory evidence. *Comrie v. Sweet, supra,* p. 201.'' We call attention in this connection to the case of *Bieser v. Stoddard,* 73 Colo. 554, 216 Pac. 707, where the matter of developed waters is discussed and a similar rule laid down.

In the present case, if the applicant is to be decreed these waters as developed waters, it is necessary to ask and answer the question: Has the quantity of water in Wrights Springs Draw been increased by reason of the efforts of the petitioner? A part of the development work, namely the tile or drainage box system paralleling the county road, was put in by the county without any effort or expense on the part of petitioner; and under our holding in the case of *Farmers' Union Ditch Co. v. Rio Grande Canal Co.,* 37 Colo. 512, 86 Pac. 1042, such construction by the county, even though water is developed, does not give the applicant, whose efforts did not contribute to its development, any right therein superior to that of other appropriators on the stream. While the *Farmers' Union Ditch Co. v. Rio Grande C. Co., supra,* is conclusive against petitioner so far as the water developed through the drain constructed by the county is concerned, it is not necessary to determine the matter on that ground alone. In that case we said: ''The claimants expended no money or labor, in the way of driving the tunnel from which the water flows, nor have they purchased any rights which the persons driving the tunnel might have had therein. The water from the tunnel finds its way to the stream and has become a part thereof. It inures to the benefit of

all taking water therefrom. In this particular water the claimants have no interest or right which will permit them to segregate a volume of water equal to that flowing from the tunnel, even if it be an actual increase, and assert an exclusive right thereto as against others diverting water from the stream. *La Jara Creamery & Live Stock Association v. Hansen*, 35 Colo. 105.''

■ The uncontroverted evidence in this case is that the tile drain paralleling the road was constructed by the county to intercept waters before they drained into the road. The statement of facts as to the topography of the country shows conclusively that the water from the Dunham land, if not intercepted by the two mentioned drains, would ultimately have found its way into the channel of Wright's draw. The trial judge recognized this natural law of gravitation, of which all courts take judicial notice, when he said, in response to an offer of the respondents to prove by the witness Elliott that the waters of the swamp lands drained by the two systems would ultimately find their way into Wright's draw: ''I think that is apparently true except as to the portion allowed for evaporation.'' The trial court found: ''That except for the construction of the upper portion of the Cless ditch [referring to the underground drains], the construction of the highway and later installation of the 1573 feet of boxed conduit, the flow of water underground or escape of surplus from the surface naturally would have gone down the basin to the outlet below the Dalpez headgate.'' In our opinion, the evidence, as disclosed by the record, amply justifies the finding of the court that this water from the swamp land ultimately would have found its way into Wright's draw. As to the finding that it would have gone into the draw below the headgate of the Moreland ditch belonging to Dalpez, we have found no support in the evidence. The court's conclusion as to this fact may have resulted from his inspection of the premises; however, we do not deem it material whether the waters reached Wright's draw above or

below the Dalpez headgate. If it reached the draw at all, either from natural springs or from a bog created by seepage from higher irrigated lands, the water belonged to the stream and those who had appropriated from the stream were entitled to use it according to their decreed priorities. In the case of *Comstock v. Ramsay,* 55 Colo. 244, 133 Pac. 1107, we said: "There is no law anywhere to support the contention that if these waters are naturally tributary to the river, still they may be taken by a new claimant to the damage and injury of prior appropriators upon that stream, simply because he captures and diverts them before they actually get into the river channel. If such act of capture and diversion can be upheld as lawful and proper, by the same reasoning a new claimant could divert the waters of a surface tributary, if he only be spry enough to capture and divert them before they actually reach and mingle with the waters of the main stream. When it is shown or admitted that these waters ultimately return to the river and thereby augment and replenish its flow, they are part and parcel thereof, whether the limit within which this occurs be short or long. The moment they are released by a user under an appropriation from the river, which has been duly decreed, and start back in their course to the stream, they become and are as much a part thereof as when they actually reach the stream. Whenever these waters start to flow back to the river and it is apparent they will reach it, they constitute a part of the stream and are not subject to independent appropriation as new or added water, or because they have been used to serve one priority and have been thus artificially brought into that position. * * * What and all we do intend to here determine, on this particular point, is that where it appears that such waters are in fact tributary to the stream, and form a substantial and material source of its supply, upon which appropriators therefrom have long depended for water to satisfy their priorities, that then, as between such bona fide appropri-

ators and users of such waters and a new claimant, the former has the first and better right.''

If the trial court's finding, that the water entered below the Moreland headgate, was wrong and it in fact entered above the Moreland headgate, then, without doubt, Nix could only be decreed a priority subsequent to that of any of the priorities decreed to the Moreland ditch. The record shows that the Moreland ditch was decreed priorities 6, 10, 17, 20 and 22. The record does not show directly that there were other priorities adjudicated out of Wright's draw or out of Maverick draw, into which Wright's draw flows, but in various places in the record reference is made to ditches further down the stream the existence of which was assumed by court and counsel. Since the trial court found that the water here involved, if not intercepted, would have found its way into Wright's draw and Maverick draw—in other words, that it belonged to the stream—all of the parties in the district who had appropriations down the stream were necessary parties, if the priority of the petitioner Nix was to be adjudicated as of a date later than the date of the last decreed priority in general adjudication proceedings. This was clearly determined by this court in the case of *Kibbee v. Kostelic*, 87 Colo. 215, 287 Pac. 652, wherein the following language is used: ''The court likewise had jurisdiction to entertain the application of Kostelic, but we think, in the exercise of its jurisdiction, it reached the wrong result. Section 1788, under which both the application of Pledger and Kostelic were initiated, provides that the owner of a priority who has failed to offer evidence under *any* adjudication provided for by our statutes, may obtain leave and make proof of such priority, but in ascertaining and determining the same, by repeated decisions of this court, the priority awarded in such circumstances must bear a date later than the latest priority awarded in the general decree in that district. There is no dispute about this general proposition.''

Counsel for petitioner virtually concede this fact when they say in their brief: "If the Cless water is not developed water, then the petitioner would be required to take a decree junior to the other appropriators from the draw which would be Dalpez, claiming under the Moreland decree."

The trial court having determined that the waters appropriated by Nix and sought herein to be decreed would ultimately find their way into and become a part of the stream in Wright's draw, a conclusion that we think is amply supported by the evidence, such finding established the fact that the waters were not subject to sale by Dunham, the original owner of the land, to Cless the predecessor in interest of Nix, in consideration of an agreement to drain the land or for any other consideration. Since such waters ultimately find their way into the natural stream they are a part of the supply of the stream and belong to the public until appropriated and put to a beneficial use under the requirements of law, a compliance with which is necessary to initiate a right therein. If the waters could not be sold, then the attempted sale by Dunham to Cless in consideration of his draining the lands, gave to the latter no right therein; Nix, his successor in interest obtained no right, and there is, therefore, no basis for the claim of title by adverse user or prescription, for any user of waters under such circumstances would of necessity be but an appropriator thereof subject to the appropriations of others on the stream who were prior in time.

The judgment of the trial court is reversed and the cause remanded with instructions, that if petitioner desires to proceed further, he shall cause notice to be served on all parties with decreed priorities subsequent to the date of appropriation claimed by petitioner, and on all other appropriators from the stream, if any, whose rights are undecreed, whether their appropriations are prior or subsequent to the appropriation claimed by petitioner as the foundation of his right.