No. 22372.

PIKES PEAK GOLF CLUB, INC., A COLORADO CORPORATION *v.* C. J. KUIPER, STATE ENGINEER OF THE STATE OF COLORADO; JOHN W. PATTERSON, DIVISION ENGINEER, IRRIGATION DIVISION No. 2 IN THE STATE OF COLORADO; RUFUS S. MARSHALL, WATER COMMISSIONER OF WATER DISTRICT No. 10 IN THE STATE OF COLORADO; CHILCOTT DITCH CO., A COLORADO CORPORATION; THE MILLER DITCH; AND LISTON AND LOVE DITCH.

(455 P.2d 882)

Decided June 16, 1969.     Rehearing denied July 14, 1969.

310

STRAND, HOLST and HILBERT, DALE L. HOLST, SAUNDERS, DICKSON, SNYDER & ROSS, P.C., GLENN G. SAUNDERS, for plaintiff in error.

DUKE W. DUNBAR, Attorney General, JOHN P. MOORE, Deputy, JAMES D. GEISSINGER, Assistant, BEN L. WRIGHT, Special Assistant, for defendants in error C. J. Kuiper, John W. Patterson and Rufus S. Marshall.

DAVIS, GRAHAM & STUBBS, CLYDE O. MARTZ, WILLIAM A. HILLHOUSE, for defendants in error Chilcott Ditch Co., the Miller Ditch, and Liston and Love Ditch.

*In Department.*

Opinion by Mr. Justice Moore.*

Plaintiff in error will be referred to as the Golf Club, and defendants in error will be referred to collectively as defendants or individually by name.

Pertinent allegations of the complaint filed by the Golf Club are as follows:

"8. This is an action brought for review in this Court of the action by the State Engineer and his subordinate water administration officials in ordering the plaintiff to release its salvaged water for the benefit of appropriators of water out of said Fountain Creek as if said water were subjection to appropriation, which it is not. * * *

"9. The Plaintiff, is adversely affected and aggrieved by the ruling of the State Engineer for the following reasons:

"a. The waters salvaged by the Plaintiff at great expense to it are the only source of supply available to the Plaintiff for the irrigation of its golf course and to be deprived of their use by the action of the State Engineer and his subordinate water administration officials would destroy not only the investment in excess of $200,000.00 involved in the creation of the extensive drain system under the land, but also to destroy the utilization of the land for the golf course which is entirely dependent, now that the underflow of water is drained by the drainage system, upon the artificial irrigation available only from the source developed by the Plaintiff as hereinabove set forth.

"b. The State Engineer and the other official defendants, by their various rulings have attempted, by color of the authority of their official positions to unlawfully, arbitrarily, and capriciously deny to, and deprive the Plaintiff of the right to the use of water which is not now and never has been part of or tributary to any nat-

*Retired Supreme Court Justice sitting under assignment by the Chief Justice under provisions of Article VI, Section 5(3) of the constitution of Colorado.

ural water course of the State of Colorado and is not subject to the administration of the State Engineer and his subordinate water administration officials.

"c. The State Engineer has ignored the facts and particularly those shown in the subject record which demonstrate this condition with the result that his Ruling is wholly unsupported by the evidence in said record."

Defendants denied the foregoing allegations. A full transcript of the proceedings before the State Engineer was certified to the district court and after considering arguments of counsel the action of the State Engineer was sustained.

As grounds for reversal of the judgment it is argued that, under the uncontradicted evidence, the reclamation of plaintiff's swamp land resulted in net accretions to the stream benefiting appropriators of water from Fountain Creek by supplying from 25 to 74 acre feet of water per year more than that which was available from the terrain in its natural condition. This increase in the amount of water which left the Golf Club property and became part of Spring Creek was brought about by the expenditure of approximately $200,000 by the Golf Club in the installation of improvements consisting of drain tiles and a collection system by which the water theretofore consumed by transpiration in the subirrigation of native hay crops was drained away and collected in a system of small ponds and reservoirs. The effect of this was to dry out a substantial portion of the land upon which natural hay and pasture had always grown, thereby permitting the conversion of 95 acres thereof to the irrigated parts of a golf course.

There was no competent evidence disputing the fact that after the use of the water thus collected for the irrigation of the golf course there is a substantial increase in the amount of water leaving the premises over the amount which had at all times theretofore left the lower end of the property prior to the installation of the improvements. The undisputed evidence was that in

the original condition of the land the subirrigation of the plant life consumed 240 acre feet per year. Assuming, without so deciding, that historically there was any natural water course across the land in question, it is clear that this 240 acre feet of water never was a part of any natural stream leaving the lower boundary of the property.

There was a strata of Pierre shale three to four feet in thickness at varying and relatively shallow depths below the surface of the swampy ground upon which water was standing most of the time, and below the subirrigated ground upon which water was not always visible. This shale is very impervious and where, as here, it lies underground, water which comes in contact with it "will just travel on the surface of the Pierre Shale." The existence of this shale caused the marsh areas and the subirrigation of plant life on the Golf Club land at all times prior to the man made changes in conditions at they existed in the natural state. As already stated, the transpiration of water resulting from this natural condition was 240 acre feet per year, none of which at any time became a part of any natural stream. At the southwest corner of the land belonging to the Golf Club, which is the low point on the property, the Pierre shale appeared at about surface level, and at this point a small amount of water would occasionally flow over the shale and enter Spring Creek, but this periodical flow had no effect whatever upon the constant annual transpiration of 240 acre feet of water from the area above the southwest corner of the property.

Mr. Pring, the predecessor in interest to the property in question, lived on the property from 1930 until the golf course was built. He explained the manner in which 400 tons of hay per year was harvested from the subirrigated and marsh land, as follows:

"A. It was a difficult thing, I can assure you. At that time we were still using horsedrawn implements. You would start from the sides and you would race through and

hope you got through before the horses and machinery fell out of sight. Then when it came time to collect the hay, you would go through and drag it out of the water so that it could dry and cure.

\* \* \*

"Q. All right. Then you say you dragged the hay out for curing. How much of an area was thus exposed constantly to evaporation as well as plant transpiration by reason of there being a permanent body of water standing in the area?

"A. This can at best be nothing but a guess, as I am sure you can appreciate, or an educated estimate at best. But I would say approximately fifty acres would probably have surface water standing on it, with another 140 acres or approximately that which was subirrigated, but actually wouldn't have water literally standing on it over any prolonged period of time."

The authority of water officials to administer water is limited to that which has become a part of, or is tributary to, a natural stream. *Whitten v. Coit,* 153 Colo. 157, 385 P.2d 131. A natural stream normally consists of surface waters, the underflow which supports these surface waters, and tributary water. *Nevius v. Smith,* 86 Colo. 178, 279 P. 44.

Reduced to essentials, the position of the ditch operators, who are the real parties in interest among the defendants, is that they should be the beneficiaries of the investment made by the Golf Club to the full extent of 240 acre feet of water per year, none of which was available to them in the natural state before the creation of the golf course.

A number of opinions of this court have announced principles under varying factual situations comparable to those involved in this action, which indicate that the trial court erred in sustaining the action of the State Engineer. We direct attention to the somewhat analogous situation found in *Leadville Mine Develop-*

*ment Company v. Anderson,* 91 Colo. 536, 17 P.2d 303, from which we quote the following:

"Where a person by his own efforts has increased the flow of water in a natural stream, he is entitled to the use of the water to the extent of the increase. (Citing cases.) * * *"

From *Cline v. Whitten,* 144 Colo. 126, 355 P.2d 306, we quote:

"There are no Colorado constitutional or statutory inhibitions against a person on whose lands spring water arises, which water is not tributary to and does not enter a natural stream, from using said water on his lands. * * *"

The 240 acre feet of water involved in this controversy are not tributary waters historically, and are not subject to administration by the State Engineer.

The judgment is reversed and the cause remanded with directions to vacate the orders approved by the State Engineer.

MR. JUSTICE DAY, MR. JUSTICE HODGES and MR. JUSTICE LEE concur.