**Southeastern Colorado Water Conservancy District; Fort Lyon Canal Company; and Holbrook Mutual Irrigating Company v. Shelton Farms, Inc.**

## No. 26432

**Southeastern Colorado Water Conservancy District v. Colorado-New Mexico Land Co., Inc.**

(529 P.2d 1321)

Decided December 16, 1974. Rehearing denied January 6, 1975. Opinion modified and as modified rehearing denied January 20, 1975.

182

Fairfield and Woods, Charles J. Beise, Howard K. Holme, for objector-appellant Southeastern Colorado Water Conservancy District.

Lefferdink, Legg and Nieschburg, John J. Lefferdink, for objector-appellant Fort Lyon Canal Company.

Ralph N. Wadleigh, for objector-appellant Holbrook Mutual Irrigation Company.

Mendenhall & Mendenhall, Cover Mendenhall, H. Barton Mendenhall, for claimant-appellee Shelton Farms, Inc.

Moses, Wittemyer & Harrison, P.C., John Wittemyer, for claimant-appellee Colorado-New Mexico Land Co., Inc.

Davis, Graham & Stubbs, Clyde O. Martz, William A. Hillhouse II, Lenard D. Rioth, for Colorado Water Protective and Development Association, amicus curiae.

*En Banc.*

MR. JUSTICE DAY delivered the opinion of the Court.

This is an appeal from two judgments and decrees awarding appellees Shelton Farms and Colorado-New Mexico Land Company ("the Company") water rights free from the call of any and all senior decreed water rights on the Arkansas River.

This case, so far as we are advised, is of first impression in the United States, dealing with whether the killing of water-using vegetation and the filling of a marshy area to prevent evaporation can produce a superior water right for the amount of water not transpired or evaporated. The Pueblo district court held it could, and granted both Shelton and the Company such a water right.

The facts differed slightly in each case. However, the issues presented were so similar that the cases were consolidated before us on appeal, brought by the objectors Southeastern Water Conservancy District ("the District") and others in the Shelton case, and the District as sole objector in the Company case. We hold for the objectors, and reverse each judgment and decree.

I.

To comprehend the importance of this lawsuit, it is necessary to understand the Arkansas River and its tributaries.

In 1863 there were virtually no "water-loving" trees along the banks of the river. Their growth was prevented when the great

roaming buffalo herds ate the saplings, and the native Indians used most of the timber. In the next 40 years both the buffalo and the Indians were decimated. Phreatophytes (water consuming plants) and cottonwood began to appear along the Arkansas. After the great Pueblo flood of 1921 the river bottom became thickly infested with tamarisk or salt cedar, a highly phreatophytic growth.

Since 1863 all surface flow of the river has been put to beneficial use, until today the Arkansas is greatly over-appropriated. There is not enough flow to satisfy decreed water rights. The phreatophytes have hindered the situation, for they have consumed large quantities of subsurface water which would otherwise have flowed in the stream and been available for decreed use.

In 1940, appellee Shelton bought 500 acres of land on the Arkansas River. Since then, he has cleared two land areas of phreatophytes, and filled in a third marshy area. Shelton claimed he had saved approximately 442 acre-feet of water per year, previously consumed by phreatophytes or lost to evaporation, which is now available for beneficial use. Shelton had 8 previously decreed wells. He asked for the right to augment his previous water rights with the salvaged water, to use during those times when pumping is curtailed by the State Engineer.

The objectors Southeastern Water Conservancy District, and others, moved to dismiss the augmentation application. The motion was denied and trial was held. The lower court awarded Shelton 181.72 acre-feet of water, free from the call of the river. The lower court analogized to the law of accretion, stating that the capture and use by another of water which ordinarily would be lost is not detrimental to prior holders. The decree contained a comprehensive series of safeguards to protect the prior vested interests. In an amendment to the decree, the trial court held that although 1971 Perm. Supp., C.R.S. 1963, 148-21-22 requires that later water rights adjudicated should be junior to prior decreed water rights, the provision did not apply in this case.

Appellee Colorado-New Mexico Land Co., Inc., received a similar award of 181 acre-feet of water, not to exceed 161 acre-feet in any one year, free from the call of the river. One Phelps

had removed phreatophytes from his land, and obtained a conditional decree. The claimant Company acquired the land from Phelps, applied to have the decree made final, and the application was approved. The facts in this case differ only because there was no plan of augmentation, as there was with Shelton. In addition, the hearing before the water referee was uncontested, and that ruling was subsequently approved by the district judge without opposition. The Water Conservancy District learned of the Company decree 20 days later, but took no action until the filing of other similar applications. The District then contested the final judgment. It also appealed the Shelton award, together with other objectors, Fort Lyons Canal Company and Holbrook Mutual Irrigation Company.

## II.

The facts in each case are not disputed. Before this Court is totally a question of law. The issue can be stated very simply: May one who cuts down water-consuming vegetation obtain a decree for an equivalent amount of water for his own beneficial use free from the call of the river?

Appellees state that the Water Right Determination and Administration Act ("the Act"), 1969 Perm. Supp., C.R.S. 1963, 148-21-1 *et seq.,* permits augmentation or substitution of water captured. Those are flexible terms. Thus, appellees feel that the source of water so provided — whether developed or salvaged — is immaterial, so long as prior vested rights are not injured. They insist that but for their actions the salvaged water would have been available to no one, so now they may receive a water right free from the call of prior appropriators, who are in no way harmed. Appellees conclude that their actions provide maximum utilization of water, protect vested rights, and encourage conservation and waste reduction in the water-scarce Arkansas River Valley.

Also appearing here is the Colorado Water Protection and Development Association, which has filed an amicus brief in support of both judgments below. The Association is presently developing and implementing a plan for augmentation, similar to Shelton's, to permit its member wells to continue pumping, allegedly without injury to vested senior rights on the river.

The objectors assert that the lower court's resolution of the issue does violence to Colorado's firm appropriation doctrine of "first in time — first in right" on which the priority of previous decrees is bottomed. They point out that the existing case law in Colorado, which was not changed by statute, limits the doctrine of "free from call" to waters which are *truly developed and were never part of the river system.* They argue that appellees' claims were not for developed water, and thus must come under the mandates of the priority system. Furthermore, a priority date free from the call of the river will impinge the entire scheme of adjudication of water decrees as required by the Act.

There is no legal precedent squarely in point for either denying or approving these claims. The answer requires consideration of judicial precedent relating to "developed" and "salvaged" water, as well as consideration of the provisions of the Water Act. Also squarely before us is the equally serious question of whether the granting of such a unique water right will encourage denuding river banks everywhere of trees and shrubs which, like the vegetation destroyed in these cases, also consume the river water.

### III.

■ We first consider existing case law. There is no question that one who merely clears out a channel, lines it with concrete or otherwise hastens the flow of water, without adding to the existing water, is not entitled to a decree therefor. *Buckers Irrigation Co. v. Farmers Ditch Co.,* 31 Colo. 62, 72 P. 49 (1903); *Comstock v. Ramsay,* 55 Colo. 244, 133 P. 1107 (1913); *Bieser v. Stoddard,* 73 Colo. 554, 216, P. 707 (1923); *Comrie v. Sweet,* 75 Colo. 199, 225 P. 214 (1924); *Leadville Mine Development Co. v. Anderson,* 91 Colo. 536, 17 P.2d 303 (1932); *Dalpex v. Nix,* 96 Colo. 540, 45 P.2d 176 (1935); *DeHaas v. Benesch,* 116 Colo. 344, 181 P.2d 453 (1947); *Safrenek v. Limon,* 123 Colo. 330, 228 P.2d 975 (1951); *Black v. Taylor,* 128 Colo. 449, 264 P.2d 502 (1953); *Fellhauer v. People,* 167 Colo. 320, 447 P.2d 986 (1968).

■ It is equally true and well established in Colorado that one who *adds* to an existing water supply is entitled to a decree affirming the use of such water. Strong evidence is required to prove the addition of the water. *Leadville Mine Development*

*Co., supra.* There are three important situations, analogous to this case, when these rare decrees have been granted. The first is when one physically transports water from another source, as when the Water Conservancy District transported water from the Frying Pan River basin to the Arkansas River. The second is when one properly captures and stores flood waters. The third is when one finds water within the system, *which would never have normally reached the river or its tributaries.* An example is trapped water artificially produced by draining a mine. *Ripley v. Park Center Land and Water Co.,* 40 Colo. 129, 90 P. 75 (1907). Another example is trapped water in an independent saucepan-type formation composed of impervious shale which prevents the water from escaping. *Pikes Peak v. Kuiper,* 169 Colo. 309, 455 P.2d 882 (1969).

■ A thorough research by all parties, including the amicus, shows no Colorado case where a person has been granted a water right free from the call of the river for water which has always been tributary to a stream. If it is shown that the water would ultimately return to the river, it is said to be part and parcel thereof, and senior consumers are entitled to use it according to their decreed priorities. Even the *Pikes Peak* case, *supra,* relied on heavily by appellees, states that ". . . it is clear that this 240 acre-feet of water *never was part of any natural stream . . . .*" (Emphasis added.)

■ Thus, this case law draws a distinction between "developed" and "salvaged" water. Both terms are words of art. Developed implies *new* waters not previously part of the river system. These waters are free from the river call, and are not junior to prior decrees. Salvaged water implies waters in the river or its tributaries (including the aquifer) which ordinarily would go to waste, but somehow are made available for beneficial use. Salvaged waters are subject to call by prior appropriators. We cannot airily waive aside the traditional language of the river, and draw no distinctions between developed and salvaged water. To do so would be to wreak havoc with our water law. Those terms, and others, evolved specifically to tread softly in this state where water is so precious.

■ The roots of phreatophytes are like a pump. The trees,

which did not have to go to court or seek any right, merely "sucked up" the water from prior appropriators. Appellees now take the water from the trees. Therefore, appellees also are continuing to take from the appropriators, but seek a court decree to approve it. They added nothing new; what was there was merely released and put to a different use. To grant appellees an unconditional water right therefor would be a windfall which cannot be allowed, for thirsty men cannot step into the shoes of a "water thief" (the phreatophytes). Senior appropriators were powerless to move on the land of others and destroy the "thief" — the trees and phreatophytes — before they took firm root. They are helpless now to move in and destroy them to fulfill their own decrees. The property (the water) must return from whence it comes — the river — and thereon down the line to those the river feeds in turn.

## IV.

■ Each appellee decree was assigned an historical priority date. However, each decree was nevertheless to be free from the call of the river. In other words, despite a paper date the decree was to be outside the priority system, in derogation of the "first in time — first in right" water theory normally followed in Colorado.

Appellees argue that there is no injury to prior appropriators by this unusual practice. They assert that the water was unavailable for use anyway, so to grant it to another harms no one, yet benefits the policies of maximum utilization and beneficial conservation. Objectors counter that any decree so granted would found a new system of "last in time — first in right," and make administration of the priority system of the Act impossible.

Appellees would substitute the priority doctrine with a lack of injury doctrine. In *Fellhauer v. People, supra,* we spoke of the future of water law:

"* * * It is implicit * * * that, along with *vested rights,* there shall be *maximum utilization* of the water of this state. As administration of water approaches its second century the curtain is opening upon the new drama of *maximum utilization* and how constitutionally that doctrine can be integrated into the law of *vested rights.* We have known for a long time that the doctrine was lurking in the backstage shadows as a result of the accepted,

though oft violated, principle that the right to water does not give the right to waste it.'' (Emphasis original.)

The Colorado legislature responded to the *Fellhauer* decision and its twin mandates of protecting vested rights and achieving maximum utilization by enacting various amendments to the 1963 Water Right Determination and Administration Act. 1969 Perm. Supp., C.R.S. 1963, 148-21-2(1) is a declaration of policy that all waters in Colorado have been

''* * * declared to be the property of the public, * * *. As incident thereto, it shall be the policy of this state to integrate the appropriation, use and administration of underground water tributary to a stream with the use of surface water, in such a way as to maximize the beneficial use of all of the waters of this state.''

Section 148-21-2(2) further states that

''(a) * * * it is hereby declared to be the further policy of the state of Colorado that in the determination of water rights, uses and administration of water the following principles shall apply:

''(b) *Water rights and uses heretofore vested* in any person by virtue of previous or existing laws, including an appropriation from a well, *shall be protected* subject to the provisions of this article.

''(c) The existing use of ground water, either independently or in conjunction with surface rights, shall be recognized to the fullest extent possible, *subject to the preservation of other existing vested rights. * * ** 
* * *

''(e) No reduction of any lawful diversion because of the operation of the priority system shall be permitted unless such reduction would increase the amount of water available to and required by water rights having senior priorities.'' (Emphasis added.)

We do not read into the enactment of the post-*Fellhauer* amendments carte-blanche authority to substitute water consumption and raise it to a preferential right.

Beyond question, the Arkansas River is over-appropriated. Water promised has not been water delivered, for there is simply not enough to go around. Thus, the question is not whether prior appropriators are injured *today* by appellees' actions. The injury

occurred *long ago,* when the water-consuming trees robbed consumers of water which would have naturally flowed for their use. The harm was real and enormous. The logical implication of the injury standard is that *until senior consumers have been saturated to fulfillment,* any displacement of water from the time and place of their need is harmful to them.

Perhaps most important is the mandate of 1971 Perm. Supp., C.R.S. 1963, 148-21-22. This sets up the priority system of "first in time — first in right" in Colorado:

"* * * the priority date awarded for water rights * * * adjudged and decreed on applications for a determination of the amount and priority thereof * * * during each calendar year shall establish the relative priority among other water rights * * * awarded on such applications filed in that calendar year; *but such water rights * * * shall be junior to all water rights * * * awarded on such applications filed in any previous calendar year * * *.*" (Emphasis added.)

■ This section cannot be ignored, as it is part of the same overall Act. There is nothing in the plain language of the statute to exempt appellees' plans from the priority date system. Thus, we hold that all water decrees of any kind are bound to the call of the river, subject to any specific exemptions found within the law. To hold any other way would be to weaken the priority system, and create a super class of water rights never before in existence.

We arrive at the instant decision with reluctance, as we are loathe to stifle creativity in finding new water supplies, and do wish not to discourage maximized beneficial use of Colorado's water. But there are questions of policy to consider. If new waters can be had by appellees' method, without legislative supervision, there will be perhaps thousands of such super decrees on all the rivers of the state. S. E. Reynolds, State Engineer of New Mexico for many years, pointed out the dangers inherent in this procedure:

"* * * If one ignores the technical difficulty of determining the amount of water salvaged, this proposal, at first blush, might seem reasonable and in the interest of the best use of water and related land resources.

* * *

"On closer scrutiny, it appears that if the water supply of prior existing rights is lost to encroaching phreatophytes and then taken by individuals eradicating the plants the result would be chaos. The doctrine of prior appropriation as we know it would fall — the phreatophytes and then the individual salvaging water would have the best right. Furthermore, if individuals salvaging public water lost to encroaching phreatophytes were permitted to create new water rights where there is no new water, the price of salt cedar jungles would rise sharply. And we could expect to see a thriving, if clandestine, business in salt cedar seed and phreatophyte cultivation."

If these decrees were affirmed, the use of a power saw or a bull-dozer would generate a better water right than the earliest ditch on the river. The planting and harvesting of trees to create water rights superior to the oldest decrees on the Arkansas would result in a harvest of pandemonium. Furthermore, one must be concerned that once all plant life disappears, the soil on the banks of the river will slip away, causing irreparable erosion.

 We are not unmindful that the statute speaks of the policy of maximum beneficial and integrated use of surface and subsurface water. But efficacious use does not mean uplifting one natural resource to the detriment of another. The waters of Colorado belong to the people, but so does the land. There must be a balancing effect, and the elements of water and land must be used in harmony to the maximum *feasible* use of both. As part of the same Act, Colo. Sess. Laws 1973, ch. 442, 148-21-3(7) at 1521 points out that

"* * * 'beneficial use' shall also include the appropriation by the State of Colorado in the manner prescribed by law of such minimum flows between specific points or levels for and on natural streams and lakes as are required to preserve the natural environment to a reasonable degree."

 We believe that in this situation unrestrained self-help to a previously untapped water supply would result in a barren wasteland. While we admire the industry and ingenuity of appellees, we cannot condone the removal of water on an *ad hoc,* farm by farm basis. The withdrawal of water must be orderly, and to be orderly it must come under the priority system.

## V.

No one on any river would be adverse to a schematic and integrated system of developing this kind of water supply with control and balancing considerations. But to create such a scheme is the work of the legislature, through creation of appropriate district authorities with right of condemnation on a selective basis, not for the courts. Until such time as the legislature responds, actions such as appellees' should not be given court sanction.

Judgments reversed and cause remanded to the trial court with directions to vacate the decrees.

MR. JUSTICE GROVES and MR. JUSTICE KELLEY specially concur.

MR. JUSTICE GROVES specially concurring:

At the conclusion of oral argument I was convinced that I should dissent. I was shocked by the thought that the water emanating through the phreatophytes is being evaporated into the air, robbing decreed rights and being lost to Colorado water users. While I knew that the remedies are properly for the legislature, it then seemed to me that, since the legislature has not acted and has thus permitted this intolerable situation to continue, the judiciary should do what it could.

However, I find myself swayed by Justice Day's opinion, and I am deterred from dissenting. I concur specially for the reason that it preserves the status quo in order to allow the state further time to attempt to rectify an alarming situation. It may pass enabling legislation for the creation of districts, as suggested in the opinion, or conclude to take some other approach. It is earnestly to be hoped that the General Assembly can provide a solution so that this water, now being lost in such large quantities to the phreatophytes may be brought under reasonable control.

I wish to state, however, that, if the General Assembly does not act within a reasonable time in this area, I hope that the matter will be brought to this Court again. Then, in order to carry out the spirit of *Fellhauer v. People,* 167 Colo. 320, 447 P.2d 986 (1968), and the legislative intent expressed in the 1971 amendments quoted in the opinion, I intend to urge the Court to reverse

the opinion and permit persons in the position of the claimants here to take the water. They will not be taking water from holders of decreed rights, but rather from the robbers of the decreed rights — the phreatophytes.

Water lost is water wasted. The judiciary should not sit by forever and permit this to continue, even though its remedies cannot be as equitable as those that surely the legislature can fashion.

MR. JUSTICE KELLEY concurs in this opinion.