Craig A. GIFFEN, Applicant-Appellant,

v.

STATE of Colorado, CITY AND COUNTY OF DENVER Acting By and Through Its BOARD OF WATER COMMISSIONERS, and Cache La Poudre Water Users Association, Objectors-Appellees.

No. 82SA333.

Supreme Court of Colorado,
En Banc.

Sept. 10, 1984.

Rehearing Denied Dec. 10, 1984.

Craig A. Giffen, pro se.

Wayne D. Williams, Michael L. Walker, Henry C. Teigen, Anne R. McGee, Casey S. Funk, Denver, for objector-appellee City and County of Denver acting by and through its Bd. of Water Com'rs.

L. Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Joel W. Cantrick, Sol. Gen., Jeffrey J. Kahn, Asst. Atty. Gen., Denver, for objector-appellee State of Colo.

Fischer, Brown, Huddleson & Gunn, Ward H. Fischer, Stephen B. Ray, Fort Collins, for objector-appellee Cache La Poudre Water Users Ass'n.

LOHR, Justice.

Craig A. Giffen (applicant) appeals from a summary judgment issued by the water judge for water division 1, denying his application for approval of a plan for augmentation which includes a proposed developed water right. *See* § 37–92–103(9), 15 C.R.S. (1983 Supp.).[1] The applicant based his claim to a developed water right on a proposal to reduce water lost to the atmosphere by replacing trees on his property with less water-consumptive grasses.

Giffen owns two adjacent parcels of 8.9 acres and 5.1 acres in the North Turkey Creek drainage in Jefferson County.[2] Each parcel has a permitted well in place which can be used solely for household purposes in a single-family dwelling. *See generally* § 37–92–602(3)(b)(II), 15 C.R.S. (1973). Giffen proposes to take additional water from the wells for out-of-the-household purposes, including the irrigation of gardens and lawn and the watering of poultry, livestock and domestic animals. His plan for augmentation contemplates replacement of this extra water by the development of an allegedly new source of water. Giffen intends to remove trees representing 80% of the basal area of the existing indigenous forest stand of ponderosa pine, lodgepole pine and Douglas fir in two areas covering a total of 2.2 acres of his 8.9 acre parcel. Non-irrigated grass will fill in

---

1. Section 37–92–103(9), 15 C.R.S. (1983 Supp.), provides:

   "Plan for augmentation" means a detailed program to increase the supply of water available for beneficial use in a division or portion thereof by the development of new or alternate means or points of diversion, by a pooling of water resources, by water exchange projects, by providing substitute supplies of water, by the development of new sources of water, or by any other appropriate means. "Plan for augmentation" does not include the salvage of tributary waters by the eradication of phreatophytes, nor does it include the use of tributary water collected from land surfaces which have been made impermeable, thereby increasing the runoff but not adding to the existing supply of tributary water.

2. As the water judge granted the objectors' motion for summary judgment on a record devoid of affidavits, depositions, answers to interrogatories, or admissions, *see* C.R.C.P. 56, we accept the facts as alleged by the applicant and not disputed by the objectors for the purpose of determining the appropriateness of summary judgment.

the open space after removal of the trees. According to Giffen, the net reduction in evapotranspiration caused by removal of the trees and replacement by the less consumptive grasses will approximate 0.25 acre feet of water per year. This water will enter the groundwater aquifer which is hydraulically connected to Turkey Creek. Giffen seeks a decree permitting diversions of 0.1 acre feet per year for use outside the household from each of his two wells. He estimates that these diversions will result in consumptive use of 0.08 acre feet annually. Because his plan for augmentation would represent a net gain to the stream system, Giffen asserted that, based upon such diversions, the water court should decree a developed water right which should not be subject to the priority system.[3]

Giffen filed an application for determination of an underground water right in 1973, and the water referee granted the application in 1976. Two parties, the State Engineer and the Board of Water Commissioners of the City and County of Denver, filed protests to the ruling of the referee. The Cache La Poudre Water Users Association later entered an appearance before the water court in opposition to the application. In 1980, pursuant to pretrial proceedings before the water judge, Giffen amended the application to describe his proposal as including a plan for augmentation. The amendment made clear that Giffen relied upon his tree removal proposal to produce the replacement water necessary to support the plan for augmentation. In 1982, the water judge granted the objectors' motion for summary judgment and denied Giffen's application. Giffen then brought this appeal.

As did the applicant in *R.J.A., Inc. v. The Water Users Association of District No. 6,* 690 P.2d 823 (Colo.1984) (decided this day),[4] Giffen contends that a developed water right, free from the priority system, may be recognized where a claimant increases the natural flow of a stream by reducing consumptive uses that existed before the first appropriations were made in the drainage. For the reasons given in *R.J.A., Inc.,* we hold that reduction of consumptive use of tributary water cannot provide the basis for a water right that is independent of the system of priorities. Such reductions cannot be considered "development of new sources of water" as part of a plan for augmentation. *See* § 37–92–103(9), 15 C.R.S. (1983 Supp.).

Giffen raises two additional issues peculiar to this case and not decided in *R.J.A., Inc.* First, he argues that the water saved is not tributary water. The water court held otherwise. According to Giffen:

> Prior to their removal, these trees intercepted rain and snow on their branches and needles, some of which evaporated directly without ever reaching the ground. In addition, the roots of these trees extracted water from the root zone of the soil and it was transmitted to the atmosphere through the process of transpiration. The removal of these trees results in a substantial reduction of evapotranspiration and the water largely remains in the root zone. Because it does, the next spring's snowmelt can fill up the root zone with a lesser volume of water than was the case before removal of the trees. This leaves more snowmelt water to enter the aquifer and to run off to the

---

**3.** In 1972, Giffen applied for a well permit on his land for an annual production of two acre feet for "domestic purposes" including irrigation of gardens and lawns. The application was denied by the state engineer because of a finding that the exercise of the requested permit would have diverted water tributary to the Turkey Creek system to the material injury of prior appropriators. Apparently, Giffen accepts that the current application for an additional 0.2 acre feet per year from the permitted wells for

outside-of-the-household purposes would reach the same end if not for the plan for augmentation, which claims to include the addition of new water to the system.

**4.** The water court issued a single written decision resolving *R.J.A., Inc.* and the present case. In doing so, the judge noted the similarity of the issues but recognized that the two applications are completely separate.

tributary streams than was available before the trees were removed.

\* \* \* \* \* \*

The waters which will be produced by Giffen's proposal are not tributary waters historically, either. Sure, there is periodic hydraulic connection between the root zone and the underlying fractured granite aquifer, which is, in turn, tributary to the stream system. But such periodic hydraulic connection is normally limited to the snowmelt runoff period just as the *Pikes Peak* [*Golf Club, Inc. v. Kuiper,* 169 Colo. 309, 455 P.2d 882 (1969)] saucepan overflow was limited to times of abundant water.

Appellant's brief at 8–9, 11.

■ Contrary to Giffen's assertion, the water saved is clearly tributary ground water under the relevant statutes. *See State v. Southwestern Colorado Water Conservation District,* 671 P.2d 1294, 1300 n. 2 (Colo.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1929, 80 L.Ed.2d 474 (1984). Tributary ground water consists of "that water in the unconsolidated alluvial aquifer of sand, gravel, and any other sedimentary materials, and all other waters [under the surface] hydraulically connected thereto which can influence the rate or direction of movement of the water in that alluvial aquifer or natural stream." § 37–92–103(11), 15 C.R.S. (1973).

■ Giffen admits that water in the root zone is hydraulically connected to the aquifer, for water moves into the aquifer from the root zone, and, thus, influences the later movements of water in the aquifer after the root zone is saturated (or, in the words of Giffen, the "soil moisture deficit" is filled to "field capacity"). Whether any particular root zone is filled is determined by the amount entering the zone through precipitation and runoff, the amount lost through evaporation and transpiration, and the holding capacity of the zone. *See* Harrison and Sandstrom, *The Groundwater—Surface Water Conflict and Recent Colorado Legislation,* 43 U.Colo.L.Rev. 1, 15–16 (1971). Thus, while it never reaches the aquifer, water lost through evapotranspira-

tion is a factor in determining how much water, if any, will influence the aquifer from a particular area at any particular time. The water lost by evapotranspiration is an integral part of a single hydraulically connected system and must be regarded as tributary to the aquifer and, subsequently, to the stream. *See* § 37–92–103(11), 15 C.R.S. (1973). The amount of water representing precipitation intercepted by branches and needles of the trees and then evaporated, though surface water rather than ground water, is also an integral, if minor, part of and tributary to the stream system for essentially the same reasons.

■ To support his claim that the relevant water is nontributary, Giffen relies partly on *Pikes Peak Golf Club, Inc. v. Kuiper,* 169 Colo. 309, 455 P.2d 882 (1969) (*Pikes Peak*), asserting that the water transpired from the root zone is analogous to the water trapped by the impervious shale in *Pikes Peak* and transpired by vegetation. 169 Colo. at 313, 455 P.2d at 884. As we hold today in *R.J.A., Inc.* (690 P.2d at 826), to the extent *Pikes Peak* can be read to hold that the transpired water was nontributary because its source was a nontributary pool of water trapped by impervious shale, it is consistent with our developed water cases. To the extent that *Pikes Peak* holds that water evaporated from soil or surface or transpired by plant life is inherently nontributary because it does not find its way to the stream, *Pikes Peak* was wrongly decided. There is no suggestion here that the root zone is impervious, as water does pass through to the underlying aquifer at a rate dependent, in part, on the amount of evapotranspiration.

■ Giffen raises a second issue not resolved in *R.J.A., Inc.* He argues that legislation passed subsequent to our decision in *Southeastern Colorado Water Conservancy District v. Shelton Farms, Inc.,* 187 Colo. 181, 529 P.2d 1321 (1975) (*Shelton Farms*), indicates a legislative intent to approve of his plan for augmentation. In *Shelton Farms,* we held that the reduction in evapotranspiration of tributary water ef-

fected by clearing water-consuming vegetation from the land could not provide the basis for a developed water right independent of the priority system. The vegetation involved in *Shelton Farms* consisted of phreatophytes. 187 Colo. at 184, 187–190; 529 P.2d at 1323, 1325–26.

In 1975, shortly after the *Shelton Farms* decision, the General Assembly revised the definition of "plan for augmentation" to add: " 'Plan for augmentation' does not include the salvage of tributary waters by the eradication of phreatophytes...." § 37–92–103(9), 15 C.R.S. (1983 Supp.). Giffen contends that the trees he proposes to remove are not phreatophytes.[5] Giffen argues that this post-*Shelton Farms* change indicates a legislative intent to confine restrictions on plans for augmentation to phreatophytes only, and not to extend such restrictions to the removal of any other type of vegetation.

We do not read the legislative reaction to *Shelton Farms* to be so comprehensive. Rather, the legislature took a cautious, narrow step in responding to the policy considerations expressed in *Shelton Farms*, 187 Colo. at 190–192, 529 P.2d at 1326–27. The General Assembly did not alter or deviate from the basic priority system for tributary water and, in fact, affirmed that system for the particular circumstance involved in *Shelton Farms* when revising the definition of "plan for augmentation." The legislature did not provide, by this revision, that a reduction in a consumptive use of tributary water by the removal of non-phreatophytic vegetation can be the basis for a developed water right outside of the priority system.

The judgment of the water court is affirmed.

---

**5.** The term "phreatophytes" was not defined by the legislature when revising the definition of "plan for augmentation." Nor was the term defined in *Shelton Farms*, except for an implication that all water-consuming plants are phreatophytes. 187 Colo. at 184, 529 P.2d at 1323. All plants consume water; however, not all plants fall within the conventional definitions of phreatophytes. Webster's New International Dictionary (2nd ed.) defines "phreatophyte" as "[a] deep-rooted plant which obtains its water from the water table or the layer of soil just above it." Elsewhere, phreatophytes are described as "deep-rooted plants, such as cottonwood or salt cedar trees, which consume water directly from the free water table in the alluvial valley." Harrison and Sandstrom, *The Groundwater-Surface Water Conflict and Recent Colorado Legislation, supra,* 43 U.Colo.L.Rev. at 2 n. 3. For the purpose of this appeal, and without sanctioning any particular definition of "phreatophyte," we accept Giffen's assertion that the trees he proposes to remove are not phreatophytes.