**R.J.A., INC.,**
**Plaintiff-Applicant-Appellant,**

v.

**The WATER USERS ASSOCIATION OF DISTRICT NO. 6; the St. Vrain and Left Hand Water Conservancy District; State of Colorado, Jeris A. Danielson, State Engineer; and State of Colorado, James R. Clark, Division Engineer, Water Division 1, Defendants in Opposition-Appellees.**

No. 83SA25.

Supreme Court of Colorado,
En Banc.

Sept. 10, 1984.

David C. Lindholm, Boulder, for plaintiff-applicant-appellant.

L. Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Joel W. Cantrick, Sol. Gen., Jeffrey J. Kahn, Asst. Atty. Gen., Denver, for defendants in opposition-appellees State of Colo., Jeris A. Danielson, State Engineer, and James R. Clark, Div. Engineer, Water Div. No. 1.

David J. Miller & Associates, David J. Miller, Kevin L. Strobel, Greeley, for defendants in opposition-appellees St. Vrain and Left Hand Water Conservancy Dist.

Grant, McCarren & Bernard, Wallace H. Grant, Longmont, for defendant in opposition-appellee Water Users Ass'n of Dist. No. 6.

LOHR, Justice.

R.J.A., Inc. (applicant) appeals from a judgment of the water judge for water division 1 denying its application for a de-

veloped water right.[1] The applicant based its claim on a project that will reduce water loss from a marshy mountain meadow by removing the underlying peat moss, thereby eliminating a saturated, seepy condition. This will decrease evaporation from the soil and surface and reduce evapotranspiration from grassy vegetation. We affirm the judgment.

R.J.A., Inc. operates a summer resort business on property located south of Estes Park, Colorado, in a mountain valley approximately 9000 feet above sea level. The property is situated at the headwaters of Tahosa Creek, which flows into St. Vrain Creek, a tributary of the South Platte River. This land originally included a 27-acre peat moss marsh which was approximately 3000 years old and, thus, was in existence long before any water rights were established on the South Platte River system. Historically, water entered this marsh from several surface streams and springs, and the area was much wetter than the surrounding lands. According to the applicant, loss of water to the atmosphere was higher from this peat moss marsh than from a well-drained mountain meadow of equivalent size. This is because the soil was saturated at or near surface level, resulting in relatively high rates of evaporation from the soil and standing water on the surface and evapotranspiration from the grassy vegetation growing throughout the marsh. While substantial amounts of water were lost to the atmosphere in this manner, the remaining water eventually

moved through or around the marsh to become the headwaters of Tahosa Creek.

In the early 1970s, the applicant undertook a project to remove the extensive deposits of peat moss underlying the marsh, drain the land, and convert the marsh to a well-drained meadow more suitable for use in the applicant's resort business. At the time of the water court hearing in 1982, R.J.A., Inc. had completed about three quarters of the planned work.

In 1979, R.J.A., Inc. filed an application for a developed water right in the district court for water division 1, seeking a decree for 22.5 acre feet absolute and 20.8 acre feet conditional to be used for augmentation and other specified beneficial uses. *See* section 37–92–302(1)(a), 15 C.R.S. (1973). The applicant claimed that the drainage of the marsh and elimination of the saturated, seepy condition would reduce the rates of evaporation and evapotranspiration, and thereby would decrease consumptive use of water by 43.3 acre feet per year.[2] Because this would represent a net gain to the stream, the applicant asserted that its water right should not be subject to administration under the priority system.

Several parties filed statements of opposition. The water referee denied the application, and the applicant filed a protest to the ruling of the referee. The case then was tried to the water judge. At the conclusion of the applicant's evidence, parties who appeared in opposition to the application moved for dismissal under C.R.C.P. 41(b)(1) on the basis that the applicant had

1. The original application was filed by Swiss Village Inn. R.J.A., Inc. succeeded to the interests of Swiss Village Inn, was substituted as the applicant in the trial court, and is the appellant here. Robert J. Akins was a principal of Swiss Village Inn and is president of R.J.A., Inc., in which he and his wife own all the stock.

2. The trial court found that much of the savings of water will result from the replacement of broad-leafed swamp grasses with thriftier types, less consumptive of water. This, according to the trial court, constituted the eradication of phreatophytes. *See Southeastern Colorado Water Conservancy District v. Shelton Farms, Inc.*, 187 Colo. 181, 529 P.2d 1321 (1975); § 37–92–

103(9), 15 C.R.S. (1983 Supp.). The applicant assails this finding, arguing that the replacement of one type of vegetation with another is not involved in this particular savings of water. Rather, the savings results from the elimination of the saturated, seepy condition that caused high rates of evaporation and evapotranspiration little related to the particular type of grass present. The applicant often asserted below that it is not claiming a savings due to a reduction of evapotranspiration by the elimination of "any bushy type of vegetation, trees or phreatophytes growing [in the area]." Trial Memorandum (before Referee), p. 2, Record at 16.

shown no right to relief.[3] After briefs were filed, the water judge granted the motion to dismiss, and the applicant brought this appeal.

■ The applicant contends that a developed water right for tributary water, free from the priority system, may be recognized where a claimant increases the natural flow of a stream by reducing consumptive uses that existed before the first appropriations were made on the stream. In support of this position, the applicant relies upon a line of cases in which we have recognized rights to developed water based upon addition of water to an existing supply. We hold that reduction of consumptive use of tributary water cannot provide the basis for a water right that is independent of the system of priorities on the stream.

As the trial court found, the water involved in the application before us is tributary to Tahosa Creek. The Water Right Determination and Administration Act of 1969, Article 92 of Chapter 37, 15 C.R.S. (1973) (the 1969 Act), provides a comprehensive scheme for adjudication of rights to tributary water and for administration of the distribution of such water. *See State v. Southwestern Colorado Water Conservation District*, 671 P.2d 1294, 1313 (Colo.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1929, 80 L.Ed.2d 474 (1984). That act provides for adjudication and administration under a system of priorities, implementing the constitutionally based right of prior appropriation in waters of natural streams. *See* Colo. Const. art. XVI, §§ 5 and 6; *State v. Southwestern Colorado Water Conservation District*, 671 P.2d at

1307–11. Thus, a "water right" means "a right to use *in accordance with its priority* a certain portion of the waters of the state by reason of the appropriation of the same." Section 37–92–103(12), 15 C.R.S. (1973) (emphasis added). "Waters of the state" are limited to waters in or tributary to natural streams. Section 37–92–103(13), 15 C.R.S. (1973). "Priority" means seniority by date of entitlement to use water from a common source. Section 37–92–103(10), 15 C.R.S. (1973). An application for determination of a water right or a conditional water right must specify the date of initiation of the appropriation. Section 37–92–302(2), 15 C.R.S. (1973). A referee's ruling granting or denying an application for a water right or a conditional water right must state its priority, section 37–92–303(1), 15 C.R.S. (1973), as must a decree entered by a water judge, section 37–92–304(7), 15 C.R.S. (1973). The division engineer and state engineer must enter in their records the judicial determinations of priority, and must regulate the distribution of water accordingly. Sections 37–92–301(3) and –304(8), 15 C.R.S. (1973). Nowhere in the entire scheme of the 1969 Act is there a suggestion that rights to tributary water independent of the priority system can be obtained.[4]

The applicant urges, however, that we have previously recognized that developed water rights, independent of the priority system, may be established as to tributary water in appropriate circumstances.[5] We have stated on several occasions that one who increases the flow of a natural stream by adding water that otherwise would not reach the stream is entitled to the use of the water to the extent of the increase.

3. The moving parties were Water Users Association of District No. 6, St. Vrain and Left Hand Water Conservancy District, and the Colorado State Engineer.

4. Tributary water that is "designated ground water" is not included in "waters of the state" and thus is not subject to adjudication and administration under the 1969 Act. Sections 37–92–103(13) and 37–90–103(6), 15 C.R.S. (1973). Tributary waters within this limited exception to 1969 Act applicability are not involved in the case now before us.

5. Whether the water court is the proper forum for adjudication of developed water rights we have not decided. The parties have not raised this issue and, for the purpose of this case, we consider that the matter is among those included in water court jurisdiction by necessary implication. *See State v. Southwestern Colorado Water Conservation District*, 671 P.2d 1294, 1309 n. 20 (1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1929, 80 L.Ed.2d 474 (1984).

*E.g., Leadville Mine Development Co. v. Anderson,* 91 Colo. 536, 17 P.2d 303 (1932). For the proposition that this doctrine can be applied to tributary water in a proper case, R.J.A., Inc. relies principally upon *Pikes Peak Golf Club, Inc. v. Kuiper,* 169 Colo. 309, 455 P.2d 882 (1969) (*Pikes Peak* ), and a trio of early cases representing sequential steps in a single lawsuit, *Platte Valley Irrigation Co. v. Buckers Irrigation, Milling & Improvement Co.,* 25 Colo. 77, 53 P. 334 (1898); *Buckers Irrigation, Milling & Improvement Co. v. Platte Valley Irrigation Co.,* 28 Colo. 187, 63 P. 305 (1900); and *Buckers Irrigation, Milling & Improvement Co. v. Farmers' Independent Ditch Co.,* 31 Colo. 62, 72 P. 49 (1903).

██ In *Pikes Peak* we reversed a state engineer's order directing that a golf club release certain water to the stream. The club saved the water by draining a marsh, thereby reducing the amount of water lost through evapotranspiration. The marsh was underlain by impervious shale, which had sustained the marshy condition. A small amount of water would occasionally flow over a low point in the shale and empty into the creek, but this flow "had no effect whatever upon the constant annual transpiration [of water from the marsh]." 169 Colo. at 313, 455 P.2d at 884. We concluded that the water transpired was "not tributary waters historically" and thus not subject to administration by the state engineer. 169 Colo. at 315, 455 P.2d at 885. To the extent *Pikes Peak* can be read to hold that the transpired water was nontributary because its source was a nontributary pool of water trapped by the impervious shale, it is consistent with our developed water cases. *See Southeastern Colorado Water Conservancy District v. Shelton Farms, Inc.,* 187 Colo. 181, 187, 529 P.2d 1321, 1324–25 (1975) (*Shelton Farms* ), which appears to read *Pikes Peak* that way.[6] To the extent it holds that water evaporated from soil or surface or transpired by plant life is inherently nontri-

butary because it does not find its way to the stream, we believe *Pikes Peak* was wrongly decided and will not follow it.

The applicant also relies on language in the *Buckers* cases in support of its claim. There, in defense of an action by senior appropriators on the South Platte River to enjoin diversions by ditch from Beaver Brook and nearby lands, Buckers claimed that its ditch work had augmented the flow of the stream. We recognized that, even if Beaver Brook were tributary to the South Platte River, Buckers could use the water to the extent that it represented increased flow developed by Buckers' efforts adding to the supply of water "theretofore wont to flow down the natural stream." 28 Colo. at 191, 63 P. at 306. Ultimately, the trial court found that there was no such increase. 31 Colo. at 68–69, 72 P. at 53. We do not read the *Buckers* cases to hold that a developed water right independent of stream priorities can be recognized in tributary waters. The language in those cases can best be understood when it is remembered that the *Buckers* litigation preceded, and was decided without the benefit of, *Comstock v. Ramsay,* 55 Colo. 244, 133 P. 1107 (1913), in which we held that seepage and percolation belong to the river, and *Safranek v. Town of Limon,* 123 Colo. 330, 228 P.2d 975 (1951), in which we held that it is presumed that all ground water finds its way to the stream in the watershed in which it lies. Subsequent developments in the law and in the science of hydrology preclude too great a reliance on general statements from the *Buckers* cases.

Review of our cases relating to developed water brings us to the same conclusion that we reached in *Shelton Farms* that under prior case law "[no] person has been granted a water right free from the call of the river for water which has always been tributary to a stream." 187 Colo. at 187, 529 P.2d at 1325. *See Pikes Peak; Sweetwater Development Corp. v. Schu-*

---

**6.** In citing *Pikes Peak* as an example of developed water rights based on water within the system that would never normally have reached the river or its tributaries, we summarized the water source as "trapped water in an independent saucepan-type formation composed of impervious shale which prevents the water from escaping." 187 Colo. at 187, 529 P.2d at 1325.

bert Ranches, Inc., 188 Colo. 379, 535 P.2d 215 (1975); *City and County of Denver v. Fulton Irrigating Ditch Co.,* 179 Colo. 47, 506 P.2d 144 (1972); *Cresson Consolidated Gold Mining & Milling Co. v. Whitten,* 139 Colo. 273, 338 P.2d 278 (1959); *DeHaas v. Benesch,* 116 Colo. 344, 181 P.2d 453 (1947); *Dalpez v. Nix,* 96 Colo. 540, 45 P.2d 176 (1935); *Leadville Mine Development Co. v. Anderson,* 91 Colo. 536, 17 P.2d 303 (1932); *Comrie v. Sweet,* 75 Colo. 199, 225 P. 214 (1924); *Bieser v. Stoddard,* 73 Colo. 554, 216 P. 707 (1923); *Ripley v. Park Center Land & Water Co.,* 40 Colo. 129, 90 P. 75 (1907); *Platte Valley Irrigation Co. v. Buckers Irrigation, Milling & Improvement Co.,* 25 Colo. 77, 53 P. 334 (1898); *Buckers Irrigation, Milling & Improvement Co. v. Platte Valley Irrigation Co.,* 28 Colo. 187, 63 P. 305 (1900); *Buckers Irrigation, Milling & Improvement Co. v. Farmers Independent Ditch Co.,* 31 Colo. 62, 72 P. 49 (1903). Thus, the developed water cases provide no support for the applicant's position.

In *Shelton Farms* we considered an application with many similarities to the one now before us. There, we reversed judgments of the water court awarding water rights free from the call of senior decreed water rights on the Arkansas River. The trial court had decreed these rights based upon the reduction of evaporation and evapotranspiration effected by clearing phreatophytes from the land and filling in a marshy area. We concluded that, since the water in question had always been tributary to the stream and was not water new to the river system, the developed water cases were inapposite. We rejected the argument that demonstration of lack of injury to vested rights could serve as a

basis for recognition of a water right outside the priority system, 187 Colo. at 188–90, 529 P.2d at 1325–27, and concluded:

> [Present section 37–92–306, 15 C.R.S. (1973) prescribing the ranking of water rights by priorities] cannot be ignored. . . . There is nothing in the plain language of the statute to except appellees' plans [for award of water rights independent of the priority system] from the priority date system. Thus, we hold that all water decrees of any kind are bound to the call of the river, subject to any specific exceptions found within the law. To hold any other way would be to weaken the priority system, and create a superclass of water rights never before in existence.[7]

187 Colo. at 190, 529 P.2d at 1326.

In *Shelton Farms* we recognized the importance of maximizing beneficial use of Colorado's water. *See Fellhauer v. People,* 167 Colo. 320, 447 P.2d 986 (1968). We noted, however, that subsequent to *Fellhauer's* strong emphasis on the importance of maximum utilization of this scarce resource, the General Assembly had not authorized the creation of a water right outside the priority system through elimination of a prior consumptive use, as sought by the applicant here. *Shelton Farms,* 187 Colo. at 188–89, 529 P.2d at 1325–26.

The applicant argues that *Shelton Farms* is not controlling because the phreatophytes in that case grew after the early water rights had been established on the river. Therefore, the plants were aptly characterized as "water thieves," and we visualized the generation of a new industry of "planting and harvesting trees to create water rights superior to the oldest decrees on the Arkansas . . . ." 187 Colo. at 191, 529

---

7. We distinguished between "developed" and "salvaged" water. The former is new water not previously part of the river system, i.e., it is imported or nontributary water. The latter is tributary water made available for beneficial use through elimination of waste. Only developed water can be made the basis of a right independent of the priority system. *Shelton Farms,* 187 Colo. at 187, 529 P.2d at 1324–25; *see Sweetwater Development Corp. v. Schubert Ranches, Inc.,* 188 Colo. 379, 383, 535 P.2d 215,

218 (1975). One example of a developed water right described in *Shelton Farms* clearly involves tributary water—the capture, storage and utilization of flood waters. 187 Colo. at 187, 529 P.2d at 1324. There are valid reasons consistent with the priority system for entering a decree in favor of the person capturing such waters. Despite our dicta in *Shelton Farms,* such a decree does not involve a right to developed water independent of the priority system.

P.2d at 1327. In the present case, however, the peat bog existed long before initiation of the earliest water right on the South Platte system. The water lost from the river system by evaporation and evapotranspiration from the seepy bog was never available for utilization by holders of senior rights. While this difference is real, we do not consider it controlling.

A separate strand of analysis supported our decision in *Shelton Farms.* We expressed concern over adoption of a rule of law that would encourage widespread destruction of plant life, with attendant likelihood of irreparable erosion and the creation of a barren wasteland. We said, "the waters of Colorado belong to the people, but so does the land. There must be a balancing effect, and the elements of water and land must be used in harmony to the maximum feasible use of both." 187 Colo. at 191, 529 P.2d at 1327. *Cf. In Re Rules and Regulations,* 674 P.2d 914 (Colo.1984) (environmental concerns are properly to be taken into account in rules and regulations promulgated by the state engineer to govern administration of diversions of tributary water).

The water rights sought here are based upon alterations of long existing physical characteristics of the land. Alteration of natural conditions and vegetation in order to save water carries with it the potential for adverse effects on soil and bank stabilization, soil productivity, wildlife habitat, fisheries production, water quality, watershed protection and the hydrologic cycle. *See* Harrison and Sandstrom, *The Groundwater-Surface Water Conflict and Recent Colorado Water Legislation,* 43 U.Colo.L. Rev. 1, 2 (1971); F. Trelease, *Water Law: Resource Use and Environmental Protection* 59 (2d ed. 1974). Whether to recognize such rights, and thus to encourage innovative ways of reducing historical consumptive uses by modifying conditions

found in nature, is a question fraught with important public policy considerations. As such, the question is especially suited for resolution through the legislative process.

■ In the 1969 Act, the General Assembly has used priority of appropriation as the sole criterion for ranking rights to tributary water. As we recognized in *Shelton Farms,* the general legislative policy of maximizing beneficial and integrated use of surface and subsurface water must be implemented with a sensitivity to the effect on other resources. The General Assembly has addressed the accommodation of the policy of maximum utilization of water and the policy of preservation of natural resources, but only in a limited way. It has expressed its concern that maximum utilization of water be balanced by preservation of the natural environment "to a reasonable degree" by authorizing appropriations on behalf of the people of the state of Colorado for that latter purpose. §§ 37–92–102(3) and 103(4), 15 C.R.S. (1973), the relevant portions of which were adopted in 1973 in Ch. 442, secs. 1 and 2, §§ 37–92–102(3) and 37–92–103(4), 1973 Colo.Sess. Laws 1521, 1521–22.

Then, in 1975, shortly after the *Shelton Farms* case was decided, the General Assembly revised the definition of "plan for augmentation" to affirm that neither the salvage of tributary waters by eradicating phreatophytes nor the increase of runoff by making land surfaces impermeable provides an increased supply of water that may be utilized to support a plan for augmentation. § 37–92–103(9), 15 C.R.S. (1983 Supp.).[8] These partial approaches to the problem reflect a cautious step-by-step legislative approach in addressing the issues. It is noteworthy, however, that in neither of these statutes has the legislature deviated from the basic priority system for tributary water when engrafting refinements upon the system.

---

**8.** The trial court held that section 37–92–103(9), 15 C.R.S. (1983 Supp.), supplied an independent basis for rejection of the applicant's claim. The applicant argues that this statute does nothing more than codify the result of *Shelton Farms.* We do not find it necessary to resolve these

differences because we decide the case on other grounds. We do note, however, that the uses for which the applicant claims the water right in this case are more extensive than augmentation and that the application before us is not an application for a plan for augmentation.

The phreatophytes in *Shelton Farms* may have presented a factually more compelling case for rejection of recognition of a developed water right through their eradication than is present here. The larger consideration of achieving maximum feasible use of both land and water, however, is also present here, with the result that we find what we said in *Shelton Farms* equally applicable in this case:

> No one on any river would be adverse to a schematic and integrated system of developing this kind of water supply with control and balancing considerations. But to create such a scheme is the work of the legislature, through creation of appropriate district authorities with right of condemnation on a selective basis, not for the courts. Until such time as the legislature responds, action such as appellees' should not be given court sanction.[9]

187 Colo. at 192, 529 P.2d at 1327.

We affirm the judgment of the water court.

---

**9.** The priority system has its roots in our state constitution. *See* Colo.Const. art. XVI, §§ 5 and 6. We express no opinion on the constitutional permissibility of any legislative scheme permit- ting rights to be acquired in tributary water of the type involved in the present case on some basis other than of priority of appropriation.