Concerning the Matter of the Rules Governing New Withdrawals of Ground Water in Water Division No. 3 Affecting the Rate or Direction of Movement of Water in the Confined Aquifer System a/k/a "confined Aquifer New Use Rules for Division 3."

Hal D. SIMPSON, in his official capacity as State Engineer for the State of Colorado, Proponent–Appellee

v.

COTTON CREEK CIRCLES, LLC., Opposer–Appellant

and

Rio Grande Water Conservation District; Rio Grande Water Users Association; and Conejos Water Conservancy District, Appellees.

No. 07SA42.

Supreme Court of Colorado, En Banc.

March 24, 2008.

Hale Friesen, LLP, Allan L. Hale, Richard A. Westfall, Denver, Colorado, Bratton Hill LLC, John R. Hill, Jr., Gunnison, Colorado, Attorneys for Cotton Creek Circles, LLC.

John W. Suthers, Attorney General, Peter J. Ampe, Assistant Attorney General, Denver, Colorado, Attorneys for the State Engineer of Colorado.

Hill & Robbins, P.C., David W. Robbins, Dennis M. Montgomery, Ingrid C. Barrier, Denver, Colorado, Attorneys for Rio Grande Water Conservation District.

Carlson, Hammond & Paddock, LLC, William A. Paddock, Mary Mead Hammond, Beth Ann J. Parsons, Denver, Colorado, Attorneys for Rio Grande Water Users Association.

Moses, Wittemyer, Harrison and Woodruff, P.C., David L. Harrison, Richard J. Mehren, Boulder, Colorado, Attorneys for Conejos Water Conservancy District.

Justice RICE delivered the Opinion of the Court.

## I. Introduction

This is an appeal from a water court's Findings of Fact, Conclusions of Law, Judgment and Decree ("judgment") upholding rules related to certain new withdrawals from the confined aquifer in Water Division Three ("the rules")[1]. Appellant Cotton Creek Circles, LLC ("Opponent") asserts that the rules are invalid because they are contrary to statute and violate the Colorado Constitution. We disagree, and we affirm the water court's judgment upholding the rules.

## II. Background

In order to adequately examine Opponent's challenges to the rules, it is necessary to understand certain background information. We first discuss the sources of water at issue and the historical treatment of that water. Next, we look to the statutory authority for the rules at issue in this case, the substance of the rules themselves, and highlights from the water court's judgment upholding the rules. Last, we review key sources of law underlying many of Opponent's challenges.

### A. Overview of Sources of Water Implicated

The rules at issue apply only to the confined aquifer in Water Division Three, which is generally coterminous with the San Luis Valley ("the Valley").[2] *See Alamosa–La*

---

1. The official title of the rules is "Rules Governing New Withdrawals of Ground Water in Water Division Three Affecting the Rate or Direction of Movement of Water in the Confined Aquifer System."

2. While Opponent did not contest the state engineer's ability to issue rules that relate only to one

particular water division, we note that in *Alamosa–La Jara v. Gould*, we affirmed the state engineer's authority to do so. 674 P.2d 914, 936 (Colo.1984) (explaining that separate delivery rules were published only in Water Division Three, and affirming the water court's approval of those rules).

*Jara v. Gould,* 674 P.2d 914, 919 (Colo.1984). This court described the Valley previously in *Alamosa–La Jara v. Gould,* noting that it is located in south-central Colorado and extends about ninety miles from north to south. *Id.* at 917. We stated:

> The major mountain boundaries are the San Juan mountains to the west and the Sangre de Cristo mountains to the east. The Rio Grande mainstem rises in the San Juan mountains, flows south-easterly through the valley to Alamosa, and then runs south through a break in the San Luis hills, which border the valley on the south, into the state of New Mexico, then along the border between Texas and Mexico, emptying into the Gulf of Mexico. The Conejos River rises in the Conejos Mountains to the south-west and flows north-easterly along the southern edge of the valley, joining the Rio Grande mainstem at Los Sauces. Despite its high altitude, short growing season, and average annual precipitation of only about 7.5 inches, the valley sustains a productive agricultural economy dependent upon irrigation water.

*Id.*

The Valley contains underground water in the form of a confined aquifer and an unconfined aquifer. *Id.* The unconfined aquifer lies above the confined aquifer, and it is directly connected with surface streams in some places. *Id.* at 917–18. Below the unconfined aquifer lie "relatively impermeable beds of clay and basalt," which separate the unconfined aquifer from the confined aquifer. *Id.* at 917. The layers of clay and basalt do not exist around the perimeter of the Valley, and so surface water recharges the confined aquifer system at those edges. *Id.* In addition, we found:

> Because the recharge areas are higher in elevation than the floor of the valley, the confined aquifer is under artesian pressure, resulting in the free flow of water from some artesian wells and springs at natural breaks in the confining layer. In some places, where the confining layer is less thick and more transmissive, water

from the confined aquifer will leak upward through the confining clay layers into the unconfined aquifer.

*Id.* at 917–18. As a result, the unconfined aquifer, the confined aquifer, and the surface streams are hydraulically connected to varying degrees. *Id.* at 918.

Opponent argues that there is another source of water that should be taken into account in the rules. That water comes from the unconfined aquifer of an area known as the Closed Basin. A federal reclamation project called the Closed Basin Project has for decades "salvaged" shallow groundwater from the sump area of the Closed Basin that would have otherwise largely been lost to evaporation and evapotranspiration. *See Closed Basin Landowners Ass'n v. Rio Grande Water Conservation Dist.,* 734 P.2d 627, 629 (Colo.1987). Wells completed in the unconfined aquifer in that area provide the means to divert the salvaged water to the Rio Grande, which aids Colorado in meeting its obligations under the Rio Grande Compact, which we discuss below. *Id.*

### B. Historical Treatment of Water at Issue

According to the water court's judgment, there were already 7500 flowing wells in the Valley by 1958. Construction of wells in both the confined and unconfined aquifers continued until 1972 when the state engineer imposed a moratorium on new well permits, with the exception of permits for the unconfined aquifer in the Closed Basin. In 1981, the moratorium was extended to include the Closed Basin as well.

Administration of the water at issue is complicated by the existence of the Rio Grande Compact.[3] The compact was a resolution of competing claims on water from the Rio Grande by Colorado, New Mexico, and Texas. *Alamosa–La Jara,* 674 P.2d at 918. In 1939, the legislature of each state ratified the compact, and the United States Congress approved it. *Id.; see also* § 37–66–101, C.R.S. (2007). The compact requires Colora-

---

**3.** For a more complete description of the Rio Grande Compact, *see Alamosa–La Jara,* 674 P.2d at.918–19.

do to deliver water in the Rio Grande at the New Mexico border, though the precise amount varies according to schedules related to the natural supply of water at that time. *Alamosa–La Jara,* 674 P.2d at 918–19. The compact allows for accumulated debits of up to 100,000 acre-feet. *Id.* at 919.

However, beginning in 1952, Colorado accumulated debits beyond its allowed 100,000 acre-feet. *Id.* In 1966, Texas and New Mexico brought an original proceeding before the United States Supreme Court in an attempt to force Colorado to repay its debit. *Id.* However, that court never issued an opinion on the matter because the three states together signed a stipulation that the litigation would be stayed if Colorado met its delivery obligation on an annual basis going forward, and used all available administrative and legal powers to assure compliance. *Id.* The United States Supreme Court granted the motion. *Id.; see Texas v. Colorado,* 391 U.S. 901, 901, 88 S.Ct. 1649, 20 L.Ed.2d 416 (1968).

As a result, since 1968, the Colorado state engineer has been administering the Rio Grande mainstem and Conejos River on the basis of projected annual runoff, and water users have had their diversions substantially curtailed. *Alamosa La Jara,* 674 P.2d at 919. In 1975, the state engineer promulgated proposed rules that applied to Water Division Three. *Id.* Among those rules were some pertaining to the use of underground water. For instance, the rules provided for phasing out underground water diversions unless the water user submitted proof that the well was operating under a decreed plan of augmentation, or had a decree as an alternate point of diversion, or that the use could occur without impairing the right of a senior appropriator. *Id.* The rules went up to this court in *Kuiper v. Hogenson,* 196 Colo. 197, 583 P.2d 910 (1978), and were remanded back to a water court. That water court disapproved of the rules, holding that section 37–92–502, C.R.S. (1982), as it then existed, required the state engineer to determine that each individual well caused material injury to a senior appropriator before the well may be curtailed. *Alamosa–La Jara,* 674 P.2d at 920. The water court believed the rules to

be at odds with the policy of maximum utilization of water. *Id.*

In *Alamosa–La Jara,* we disagreed with the water court to the extent that it held that the division engineer must prove that each individual well caused a material injury to a senior user. *Id.* at 929. Rather, we held that where a stream is over-appropriated and underground aquifers significantly affect stream flow, "it may be presumed that each underground water diversion materially injures senior appropriators." *Id.* at 931. However, while this court approved of the state engineer's aquifer-wide determination of material injury, we were not satisfied that the rules took into account the policy of maximum utilization and the reasonable-means-of-diversion doctrine. Specifically, we held that the reasonable-means-of-diversion requirement may be a method of maximum utilization of integrated underground and surface waters. *Id.* at 934–35. Therefore, we agreed with the water court's holding that under certain circumstances, the state engineer may require surface stream appropriators to withdraw underground water tributary to the stream because that would be a more reasonable means of diversion. *Id.* at 935. We remanded the rules to the state engineer to consider that and other possibilities according to the reasonable-means-of-diversion and maximum utilization doctrines. *Id.*

The state engineer did not re-promulgate rules following *Alamosa–La Jara,* but the water court in this case found that the division engineer has administered wells from the confined and unconfined aquifers to ensure compliance with restrictions of water users' well permits and decrees. In addition, the state engineer and water users took steps to address issues relating to the over-appropriation of both aquifers, the protection of senior surface rights, and the Rio Grande Compact obligations.

The Closed Basin Project promised some relief from the curtailed diversions. Two years after our decision in *Alamosa–La Jara,* certain water user groups in the Val-

ley[4] entered into an agreement regarding the allocation of water from operation of the Closed Basin Project, called the Resolution Regarding the Allocation of the Yield of the Closed Basin Project ("the 60/40 agreement"). The water court took judicial notice of that agreement. The agreement provided that sixty percent of the usable yield from the project would go to the Rio Grande, and forty percent of that yield would go to the Conejos River. The parties to the agreement waived all claims against all existing wells located within the Rio Grande Water Conservation District for alleged effects on the flow of rivers resulting from the existing levels of production and use of those wells. In other words, the agreement was intended to allow existing well users to continue their existing use[5] of groundwater. While their usage would otherwise need to be curtailed to ensure compliance with the Rio Grande Compact, the 60/40 agreement was intended to provide sufficient replacement water from the Closed Basin Project to allow existing users to maintain their current levels of production and usage without injuring senior users. Since the 60/40 agreement was executed in 1985, the state engineer has declined to take action to regulate historical use of existing wells, but he has opposed any form of expansion of use or appropriation.

However, the intentions behind the 60/40 agreement may have been optimistic. The yield of the Closed Basin Project declined, and the drought of 2002 strained the existing water supply. When the state legislature considered the issue,[6] water users testified that the 60/40 agreement was an incomplete solution to groundwater problems in the valley, and it was insufficient on its own to protect senior vested water rights from injury caused by groundwater pumping.

### C. Legislative Mandate Pertaining to Rules

#### 1. HB 98–1011

The rules at issue in this case were mandated by the legislature in stages. The first legislative reference to these rules was made in House Bill 98–1011 ("HB 98–1011").[7] The bill recognized that new withdrawals of groundwater from the aquifer system in Division Three could materially injure vested water rights, and that there was at that time insufficient knowledge about the aquifer system. § 37–90–102(3)(a), C.R.S. (2003) (repealed 2004). The bill also called for the promulgation of new rules that were to be "based upon specific study of the confined aquifer system." § 37–90–137(12)(b)(I), C.R.S. (2003) (repealed 2004). In addition, the bill provided that "unappropriated water is not made available and injury is not prevented as a result of the reduction of water consumption by nonirrigated native vegetation." § 37–90–137(12)(a); § 37–90–137(12)(b)(I) (repealed 2004); § 37–92–305(6)(c), C.R.S. (2007).

#### 2. RGDSS Study & Model

Pursuant to HB 98–1011's mandate for a "specific study of the confined aquifer system," the state engineer undertook a study of the aquifer systems called the Rio Grande Decision Support System study ("the RGDSS study"). See § 37–90–137(12)(b)(1) (repealed 2004). The water court calls the study "one of the most comprehensive studies of the Valley's geology and hydrology that has ever been undertaken."

The state engineer used this study to develop a groundwater model ("the RGDSS model"). The RGDSS model is a computerized model that was developed "to simulate, among other things, the flow of ground wa-

---

4. Specifically, the Conejos Water Conservancy District, the Rio Grande Water Users Association, the San Luis Valley Water Conservancy District, the Alamosa–La Jara Water Conservancy District, and the Rio Grande Water Conservancy District were parties to the agreement.

5. Existing use was defined in the agreement as the level of use attained between 1981 and 1985.

6. The issue arose when committees were considering Senate Bill 04–222, which will be discussed in Part II.C.3.

7. HB 98–1011 was enacted in 1998 and has since been repealed in part. The bill added section 37–90–102(3)(a), C.R.S. (2003) (repealed 2004). It added section 37–90–137(12)(a), C.R.S. (2007), subsection (12)(b)(I) (repealed 2004), and subsection (12)(b)(II). It also added section 37–92–305(6)(c), C.R.S. (2007).

ter," and it may be revised as new information about the aquifer systems comes to light. Rule 4.A.7. The water court devoted over forty pages of its judgment to a discussion of the RGDSS model. The court recognized some deficiencies and limitations in the model, but ultimately determined that it "meets the professional standards of the modeling protocol used," and that it is "appropriate for the uses contemplated by the Rules."

### 3. SB 04–222

In 2004, the legislature enacted Senate Bill 04–222 ("SB 04–222"), which also addressed rules to be promulgated by the state engineer.[8] The bill requires that, in promulgating rules governing the use of underground water in Division Three, the state engineer should take into consideration certain principles. Among these are the principles that the confined and unconfined aquifers shall be regulated so as to "maintain a sustainable water supply in each aquifer system," and that artesian pressures should be allowed to fluctuate within the ranges that occurred between 1978 and 2000, but should maintain "average levels similar to those that occurred in 1978 through 2000." § 37–92–501(4)(a)(I), (4)(a)(III), C.R.S. (2007). The bill also requires the state engineer to "[n]ot recognize the reduction of water consumption by phreatophytes [9] as a source of replacement water for new water uses or to replace existing depletions, or as a means to prevent injury from new water uses." § 37–92–501(4)(b)(III).

### D. The Rules

Pursuant to the authority granted to it by HB 98–1011 and SB 04–222, the state engineer promulgated the rules using its water rule power.[10] The rules, which are based on the RGDSS study, apply to any new withdrawals from the confined aquifer in Division Three that affect the rate or direction of movement of water in that aquifer system.[11] Rule 3.A.

Rule 6 sets forth requirements for new withdrawals from the confined aquifer system that will affect the rate or direction of movement of water in that system. To determine whether a withdrawal will affect the rate or direction of movement of water, the state engineer is to rely upon the RGDSS model. Rule 6.A.1. The rules require that any new withdrawal of water from the confined aquifer "must prevent injury to the vested water rights of others that would be caused by the new withdrawal." Rule 6.B.

A few requirements in the rules are of particular note. For instance, in order to prevent injury to vested rights, the rules essentially require an applicant to make a one-for-one replacement of the proposed new withdrawal. Specifically, the rules provide that in order to prevent injury to a vested water right, the applicant for a new withdrawal "must change the point of diversion of or permanently retire an existing vested water right or rights to withdraw ground water from the Confined Aquifer." Rule 6.B.2. The changed existing water right must have historical withdrawals equal to the new withdrawal, and it must be located in a place that will be sufficient to prevent injury to the vested water rights of others. Rules 6.B.2, 6.B.2.a. Alternatively, to prevent injury, the rules leave open the possibility that an applicant for a new withdrawal may demonstrate that recharge or injection of water into the confined aquifer system can prevent injury to the vested water rights of others. Rule 6.B.2.d.

Additionally, in an echo of SB 04–222, the rules prohibit any new withdrawals from

---

**8.** SB 04–222 added section 37–92–501(4)(a) through (4)(c), C.R.S. (2007), and it is still in effect.

**9.** Phreatophytes generally refer to water-consuming vegetation. *See Bd. of County Comm'rs v. United States,* 891 P.2d 952, 972 (Colo.1995).

**10.** This power will be discussed in further detail in Part IV.F. It is derived from section 37–92–501(1), which states that the state engineer "may

adopt rules and regulations to assist in" his or her duties to regulate the waters of the state.

**11.** A new withdrawal is defined as "the withdrawal of ground water from a well not yet in existence, the withdrawal of a new, increased, or additional supply of ground water from an existing well, or the conversion of an existing observation or monitoring well into a production well." Rule 4.A.8.

"caus[ing] fluctuations in artesian pressures in the Confined Aquifer to fall outside of the ranges that occurred" between 1978 and 2000. Rule 6.B.4. They also require average artesian pressure levels to remain similar to those that occurred during that time period. *Id.*

Last, the rules address the reduction of water consumption by nonirrigated native vegetation.[12] The rules state that any reduction of water usage by the vegetation does not make available unappropriated water or prevent injury to vested water rights. Rules 6.A, 6.B.7. In addition, the reduction of water consumption by nonirrigated native vegetation may not be used to offset depletions caused by a new withdrawal, and it may not be used as a source of unappropriated water available for new groundwater withdrawals. Rule 6.B.7.

### E. Water Court's Decision

After the state engineer filed the rules with the water clerk, nine protests or statements of opposition to the rules were filed, though several of those ultimately supported the rules. Water Judge O. John Kuenhold held a twenty-six-day trial on the protests of the rules in accordance with section 37–92–501(3)(a). The water court denied the protests and approved the rules as promulgated in what may well be the most comprehensive decision ever issued by a Colorado water court. The 191–page judgment includes extensive background information and discussion of the hydrogeology in the Valley, as well as substantive analyses of Opponent's various arguments against the rules.

The water court summed up its findings of fact and law near the beginning of its opinion. The court found that the hydrology and geology of the Valley are highly complex, and that the Valley's surface streams, its confined aquifers, and its unconfined aquifers are overappropriated. It found that the current rates of withdrawal from the aquifers exceed their longterm rates of recharge, resulting in groundwater "mining" of the aquifer system. New or increased withdrawals from the confined aquifer system will exacerbate that overdraft and cause out-of-priority depletions to surface streams, materially injure existing water rights in the confined and unconfined aquifers, and interfere with Colorado's ability to fulfill its obligations under the Rio Grande Compact.

The water court also found that replacement water required by the rules is necessary to prevent injury to senior water rights, to comply with standards and principles in section 37–92–501(4) (including the maintenance of a sustainable water supply), and to avoid interfering with Colorado's ability to meet its Rio Grande Compact obligations. In addition, it found the RGDSS model to be reasonably accurate and reliable, and sufficient for its intended uses under the rules.

The water court also made findings as to the validity of the rules and statutes at issue. It held that the provisions of SB 04–222 that mandate sustainability of the aquifers, and provide for a baseline period to measure artesian pressure as a means of measuring sustainability, are supported by the evidence. It upheld the legislative mandate that reduced water consumption by phreatophytes may not be recognized as a source of replacement water for new water uses, or to replace existing depletions, or as a means to prevent injury for new uses. It also upheld SB 04–222's "guiding principle that an optimum or maximum use must be sustainable." It additionally found the RGDSS model to be properly subject to a rebuttable presumption as to its accuracy under the specific circumstances at hand.

Finally, the water court ruled that the opponents had not met their burden of proof to demonstrate that the rules should be disapproved, and that even if the state engineer

---

12. The language used to refer to the vegetation at issue in this case varies. SB 04–222 and Rule 6.B.7 refer to phreatophytes, or water-consuming vegetation. HB 98–1011, Rule 6.A.2, and Rule 6.B.7 refer to "nonirrigated native vegetation," which is defined in Rule 4.A.4 as "native grasses, sedges, rushes, shrubs, trees, or other plants that rely upon precipitation or shallow ground water

for their water supply, including, without limitation, rabbit brush, greasewood, creosote, cottonwoods, and willows." While these terms could be interpreted differently, Opponent does not suggest, and we do not decide, that the language used in the rules is improper. For the purposes of simplicity, we use the terms interchangeably.

had the burden to prove that they should be upheld, the state engineer had met that burden. It held that the rules comply with the statutory requirements, including section 37–92–501 as amended by SB 04–222. It decided that neither the rules, nor the provisions of HB 98–1011 or SB 04–222, violate the Colorado or United States Constitutions. It also left open the possibility that new knowledge would at some point require findings, beliefs, assumptions, and conclusions to be reexamined using the scientific method. Therefore, the court denied the protests and approved the rules, making them effective upon the entry of its judgment.

### F. Pertinent Water Law Doctrines

The Colorado Constitution provides, "The right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied. Priority of appropriation shall give the better right as between those using the water for the same purpose." [13] Colo. Const. art. XVI, § 6. Implicit in these provisions is the principle that, "along with [v]ested rights, there shall be [m]aximum utilization of the water of this state." *Fellhauer v. People,* 167 Colo. 320, 336, 447 P.2d 986, 994 (1968). These principles of protecting vested rights and maximizing the beneficial use of water are sometimes at odds. *State Eng'r v. Castle Meadows, Inc.,* 856 P.2d 496, 505 (Colo.1993). Nonetheless, the legislature long ago recognized these "twin mandates of protecting vested rights and achieving maximum utilization." *Se. Colo. Water Conservancy Dist. v. Shelton Farms, Inc.,* 187 Colo. 181, 189, 529 P.2d 1321, 1326 (1974) (citing amendments to the 1963 Water Right Determination and Administration Act). Likewise, while this court continues to recognize the goal of maximum utilization, "including use of as much underground water as possible," the cases of this court "have always recognized that the sometimes countervailing interest of protection of vested rights must be given effect" in spite of the

doctrine of maximum utilization. *Castle Meadows,* 856 P.2d at 505.

This court has additionally expanded the concept of maximum utilization to take into account other factors, such as the impact of water use on other natural resources. We have stated that the principle of maximum utilization must be implemented "so as to ensure that water resources are utilized in harmony with the protection of other valuable state resources." *Id.* In *Alamosa–La Jara,* we interpreted section 37–92–501(e) [14] as meaning that "the objective of 'maximum use' administration is 'optimum use,' " and that "[o]ptimum use can only be achieved with proper regard for all significant factors, including environmental and economic concerns." 674 P.2d at 935; *see also Pagosa Area Water & Sanitation Dist. v. Trout Unlimited,* 170 P.3d 307, 314 (Colo.2007) (reaffirming this principle).

The doctrine of maximum utilization "does not require a single-minded endeavor to squeeze every drop of water from the valley's aquifers," and so the legislature and state engineer may take into consideration environmental factors in addition to other concerns. *Alamosa–La Jara,* 674 P.2d at 935. Consistent with these principles is the legislative mandate in SB 04–222 that the state engineer should regulate the confined and unconfined aquifers in Water Division Three so as to "maintain a sustainable water supply." § 37–92–501(4)(a)(I).

### III. Standard of Review

 This proceeding is an appeal of a water court's judgment upholding the rules. We affirm the water court's findings of fact "unless they are so clearly erroneous as to find no support in the record." *City of Black Hawk v. City of Central,* 97 P.3d 951, 956 (Colo.2004) (quoting *Gibbs v. Wolf Land Co.,* 856 P.2d 798, 801 (Colo.1993)). However, we review the water court's legal conclusions de novo. *Cherokee Metro. Dist. v. Simpson,* 148 P.3d 142, 150 (Colo.2006).

---

**13.** It is undisputed that the waters in the confined aquifer are tributary, and therefore subject to these provisions.

**14.** Section 37–92–501(e) states that one principle that should guide the state engineer is that "all rules and regulations shall have as their objective the optimum use of water consistent with preservation of the priority system of water rights."

Some of Opponent's arguments implicate the wisdom of the rules. In general, water law regulations are presumed to be valid until shown otherwise by a preponderance of the evidence. *Kuiper v. Well Owners Conservation Ass'n*, 176 Colo. 119, 138, 490 P.2d 268, 277 (1971), *overruled by Alamosa–La Jara*, 674 P.2d 914.[15] However, while courts defer to policy determinations in rule-making proceedings, that deference "does not extend to questions of law such as the extent to which rules and regulations are supported by statutory authority." *Alamosa–La Jara*, 674 P.2d at 929.

In addition, Opponent makes several challenges to the constitutionality of parts of HB 98–1011 and SB 04–222. "Statutes enacted by the General Assembly are presumed constitutional and a party asserting that a particular statute violates constitutional provisions assumes the burden of establishing such assertion beyond a reasonable doubt." *Cent. Colo. Water Conservancy Dist. v. Simpson*, 877 P.2d 335, 341 (Colo.1994).

## IV. Analysis

Opponent makes numerous attacks on the constitutional validity of the rules, but none of them holds up under scrutiny. We analyze Opponent's arguments in turn and determine that each one fails to justify invalidating the rules.

## A. Artesian Pressure Provisions Are Valid

Opponent argues that the artesian pressure provisions in SB 04–222 and the rules are invalid. Because the artesian pressure requirements in the rules merely follow the legislative mandate, this is best described as an argument against the validity of the statute itself.

According to Opponent, the artesian pressure requirements violate the right to appropriate by "locking up unappropriated water." Before we turn to this argument, we first explain the appropriation doctrine as it applies in this case. There is no right to divert additional water from the confined aquifer, unless there is unappropriated water available and that withdrawal will not materially injure the vested rights of others. *See* § 37–90–137(2)(b)(I) (providing that the state engineer may not issue a permit to construct a well unless he or she finds that unappropriated water is available for withdrawal and that the vested rights of others will not be materially injured); *Empire Lodge Homeowners' Ass'n v. Moyer*, 39 P.3d 1139, 1147 (Colo. 2001) ("The right guaranteed under the Colorado Constitution is to the appropriation of unappropriated waters of the natural stream, not to the appropriation of appropriated waters."); *Well Owners*, 176 Colo. at 143, 490 P.2d at 280 ("[W]hen adjudicated priorities are not being filled as a result of pumping, it cannot be said that this ground water is unappropriated."). Therefore, Opponent's arguments that the rules violate the appropriation provision of the Colorado Constitution must fail unless the confined aquifer contains unappropriated waters. However, the water court found that the waters in both the confined and the unconfined aquifers are overappropriated.

Opponent asserts that the correct measure of whether water is available for new appropriation is whether its use causes material injury to a senior vested right. This argument does not support overturning the water court's ruling, however, because the water court found that new or increased withdrawals from the confined aquifer system will cause material injury to existing water rights. Consequently, the artesian pressure requirements in SB 04–222 and those in the rules do not violate the constitutional right to divert unappropriated waters because the waters in the confined aquifer are not unappropriated, and thus are not subject to that right.

In addition, the provision in SB 04–222 withstands scrutiny because it has several rational bases. As the water court noted, the artesian pressure requirements help to protect vested water rights, maintain a sustainable water supply in the confined aquifer,

---

15. *Alamosa–La Jara* overruled *Well Owners* "to the degree *Well Owners* precludes consideration of a reasonable-means-of-diversion requirement as a method of maximizing utilization of integrated underground and surface waters." 674 P.2d at 934–35.

and prevent underground water use from interfering with the state's ability to fulfill its obligations under the Rio Grande Compact. The provisions in the rules are based on the legislative mandate from SB 04–222, and are valid as such.

### B. One–for–One Replacement Requirement is Valid

Opponent similarly contests the requirement in Rule 6.B.2 that will frequently have the effect of requiring an applicant for a new withdrawal from the confined aquifer to make a one-for-one replacement of that withdrawal.[16] Opponent assumes that the water court's finding that the water is being "mined"[17] is the "linchpin" for Rule 6.B.2, but this assumption is misplaced.

The basis for Opponent's challenge to Rule 6.B.2 is its assertion that the rule violates the right to appropriate. However, as discussed above, the provision cannot violate the constitutional right to divert unappropriated waters because there are currently no unappropriated waters in the confined aquifer. Consequently, while we are not convinced by Opponent's assertion that the water court's finding of mining is unsupported by the record, we need not reach that issue.

### C. Nonirrigated Native Vegetation

■ Opponent also argues that the rules related to nonirrigated native vegetation must be invalidated. Specifically, Opponent objects to the rules' use of the phrase, "unappropriated water is not made available and injury is not prevented as a result of the reduction of water consumption by nonirrigated native vegetation." See Rule 6.A.2, 6.B.7. In support of its argument that the specified language should not be included in the rules, it notes that SB 04–222 does not contain the phrase quoted above. However,

the statutory authority for the phrase is found in HB 98–1011, which uses the quoted language three times. See § 37–90–137(12)(a); § 37–90–137(12)(b)(I) (repealed 2004); § 37–92–305(6)(c). Because the rules mirror statutory law, they do not exceed the scope of the statutory authority.

■ Because we find that there is a statutory basis for the rules, Opponent's other arguments regarding the treatment of nonirrigated native vegetation are best treated as attacks on the validity of the statutory provisions. We hold that there is a rational basis for those provisions. For example, the provisions may represent an attempt by the legislature to balance the potential environmental consequences of encouraging eradication of phreatophytes against the potential benefits of salvaging water that would have been used by them. See R.J.A., Inc. v. Water Users Ass'n of Dist. No. 6, 690 P.2d 823, 828 (Colo. 1984) (recognizing that eradication of vegetation will decrease the amount of water lost through evapotranspiration, but may also adversely affect the environment, such as by affecting "soil and bank stabilization, soil productivity, wildlife habitat, fisheries production, water quality, watershed production and the hydrologic cycle"). The question of whether to encourage such changed conditions in order to permit increased water use is "fraught with important public policy considerations." Id. Thus, the legislature properly exercised its authority by resolving that issue. Id.

### D. Finding of Injury is Permissible

■ Citing Alamosa–La Jara, Opponent asserts that the rules impermissibly create an irrebuttable finding of injury in every instance of a new withdrawal. In Alamosa–La Jara, we held that provisions of rules

---

**16.** Specifically, Rule 6.B.2 requires the applicant for a new withdrawal to "change the point of diversion or permanently retire an existing vested water right or rights to withdraw ground water from the Confined Aquifer with historical withdrawals" equal to the new amount of water to be withdrawn. There is an exception to this requirement in Rule 6.B.2.d that states that nothing in the rule shall preclude the applicant for a new withdrawal from "proposing and demonstrating that injury to the vested water rights of

others that would be caused by the new withdrawal ... can be prevented through recharge or injection of water into the Confined Aquifer System."

**17.** Mining of an aquifer occurs when water is withdrawn from the aquifer at a rate in excess of the annual recharge. *Upper Black Squirrel Creek Ground Water Mgmt. Dist. v. Goss,* 993 P.2d 1177, 1183 (Colo.2000).

that presumed "that each underground water diversion materially injures senior appropriators" were permissible. 674 P.2d at 931. In so holding, however, we noted that the rules allowed individuals to "retain the right in 'each case' to challenge the application of the aquifer-wide determination of material injury to 'each diversion.'" *Id.* Opponent notes that Rule 5.F states that new withdrawals of groundwater that will affect the rate or direction of movement of water in the confined aquifer *will cause* material injury and therefore must be properly augmented. Therefore, Opponent argues that the rules eliminate any possibility of showing that a particular diversion will not in fact cause injury to vested water rights.

In fact, the rules are based on a finding of fact that a new withdrawal of groundwater from the confined aquifer will cause injury unless it is properly augmented. Rule 5.F. This finding provides the basis for a requirement that any new withdrawal must prevent injury to senior water rights. *See* Rule 6.B. Because the confined aquifer is overappropriated all the time, the only way to prevent injury to senior rights would be to require full replacement.

We also note that the rules provide an opportunity to rebut the presumption that the RGDSS model accurately determines the amount, time, and location of depletions and fluctuations in artesian pressure that would be caused by a new withdrawal. Rule 6.B.6. If an applicant for a new withdrawal successfully presents evidence that demonstrates that the withdrawal would not impact artesian pressures, the rules leave open the possibility that the applicant would be permitted to withdraw new water.

### E. The Rules Are Not Invalid Because They Fail to Regulate Existing Users

 The rules at issue regulate only *new* withdrawals from the confined aquifer. Opponent argues that by failing to regulate existing wells, the state engineer is abdicating his responsibility. To the extent that

Opponent argues that the rules must fail because they regulate only new withdrawals, and fail to also regulate existing users, we reject their argument.

Opponent does not cite any statutory provisions that could be construed as requiring the rules to regulate both existing and new water users of the confined aquifer. Indeed, SB 04–222 gives the state engineer "wide discretion to permit the continued use of underground water consistent with preventing material injury to senior surface water rights." § 37–92–501(4)(a). In addition, we note that nothing in the rules precludes further regulation of existing wells. Thus, we find that the rules do not violate statutory authority by regulating only new water uses.[18]

### F. HB 98–1011, SB 04–222, and the Rules Do Not Violate Equal Protection

 Similarly, Opponent argues that the rules violate equal protection because they regulate new diversions without regulating existing diversions, and because they regulate withdrawals from the confined aquifer but not withdrawals from the unconfined aquifer. To the extent that these distinctions are required by HB 98–1011 and SB 04–222, they argue that those statutes similarly violate equal protection.

 In order to succeed in showing that equal protection was denied, Opponent is required to show that the classification at issue "lacks a legitimate governmental purpose and, without a rational basis, arbitrarily singles out a group of persons for disparate treatment in comparison to other persons who are similarly situated." *Dillard v. Indus. Claim Appeals Office,* 134 P.3d 407, 413 (Colo.2006). In addition, "[i]f any conceivable set of facts would lead to the conclusion that a classification serves a legitimate purpose, a court must assume those facts exist." *Id.* Because a rational basis exists for treating the groups at issue here differently, Opponent's argument fails.

---

18. We note that such regulation is left to the state engineer's enforcement authority under sections 37–92–502 and –503, C.R.S. (2007), and

that he or she is free to adopt additional rules in the future.

First, there is a rational basis for treating those who would make new withdrawals from the unconfined aquifer differently from those who would make new withdrawals from the confined aquifer. While the confined and unconfined aquifers are hydraulically connected, they are separate systems with different characteristics. For instance, as the water court notes, the confined aquifer is under artesian pressure while the unconfined aquifer is not, and there is substantial evidence as to the negative effects of decreasing artesian pressure. Therefore, it would be rational to conclude that the issues facing regulation of the confined aquifer are acute and different from the issues facing regulation of the unconfined aquifer.

In addition, there is a rational basis to distinguish between those who currently have the right to withdraw water from the confined aquifer and others who have not yet obtained a water right. There are fewer, if any, due process issues with regulating potential water users who do not have any existing water rights as compared with those who have perfected a water right by actual beneficial use. Therefore, a rational basis exists for the distinction, and it does not violate equal protection.

### G. The State Engineer Was Not Required to Follow the State APA

Last, Opponent argues that the rules are subject to the state Administrative Procedure Act ("the APA"), and that the state engineer violated the procedures required by the APA. However, the rulemaking authority in this case comes from the water rule power of section 37–92–501(1). That section provides that the "state engineer may adopt rules and regulations to assist in" the performance of his or her duties to administer, distribute, and regulate the waters of the state. Because the state engineer used the water rule power to enact the rules in this case, the rules are not governed by the APA. *See Kuiper v. Hogenson*, 196 Colo. at 202, 583 P.2d at 913 (holding that the compact rule power, like the water rule power, is part of the Water Right Determination and Administration Act of 1969, and thus is not

governed by the APA). For that reason, Opponent's argument that the rulemaking procedure violated the APA is rejected.

### V. Conclusion

Because each one of Opponent's challenges to the rules at issue fails, we uphold the water court's judgment approving the rules as promulgated.

